**UNITED STATES, Appellee,**

v.

**Alvaro ROJO–ALVAREZ,**
**Defendant, Appellant.**

**UNITED STATES, Appellee,**

v.

**Adalberto FRANCO–MONTOYA,**
**Defendant, Appellant.**

**UNITED STATES, Appellee,**

v.

**Walter Antonio PALACIO–PEREZ,**
**Defendant, Appellant.**

**UNITED STATES, Appellee,**

v.

**Carlos AREVALO–GOMEZ,**
**Defendant, Appellant.**

**Nos. 90–1980 to 90–1983.**

United States Court of Appeals,
First Circuit.

Heard June 3, 1991.

Decided Sept. 10, 1991.

Rehearing and Rehearing En Banc
Denied in No. 90–1981
Oct. 18, 1991.

James T. Dangora, with whom Brian J. McMenimen and Boudreau, Burke & McMenimen, were on brief, for defendant, appellant Rojo–Alvarez.

Thomas F. Hallett, for defendant, appellant Franco–Montoya.

Peter L. Murray, with whom Jane Lee and Murray, Plumb & Murray, were on brief, for defendant, appellant Palacio–Perez.

Christopher W. Dilworth, with whom Dilworth & White, was on brief, for defendant, appellant Arevalo-Gomez.

F. Mark Terison, Asst. U.S. Atty., with whom Richard S. Cohen, U.S. Atty., was on brief, for appellee.

Before BREYER, Chief Judge, SELYA, Circuit Judge, and PETTINE,* Senior District Judge.

PETTINE, Senior District Judge.

These cases, consolidated for appeal, involve a large-scale cocaine conspiracy. The four defendants, together, present a total of eleven issues for review. We affirm the district court on all eleven issues and believe that only four of those issues merit any detailed discussion.

BACKGROUND

In an attempt to reach major drug suppliers to the Maine drug market, government undercover agents negotiated a cocaine transaction involving the delivery of thirty kilograms of cocaine. The suppliers were based in New York, the buyers were fictitious, and the delivery was to take place in Maine. Initially, only nine kilograms of cocaine were supplied to the agents at a motel in Maine. The agents, in an effort to reach the suppliers at the top of the conspiracy, refused to pay for the nine kilos until the remaining twenty-one were supplied. As negotiations for the remaining kilos continued, the agents arrested lower echelon participants and convinced them to continue their participation on behalf of the government.

The government's plan progressed until Adalberto Franco–Montoya ("Franco"), charged with being the ringleader of the conspiracy, grew impatient waiting for the promised payment and sent his representative, Alvaro Rojo–Alvarez ("Rojo"), to Maine for it. If payment was not made, Rojo was to bring back the nine kilos of cocaine. Soon thereafter, Franco, himself, went to Maine accompanied by Walter Antonio Palacio–Perez ("Palacio") and Carlos Arevalo–Gomez ("Arevalo"). After discussions, the government agents agreed to return the nine kilos of cocaine. To facilitate its return, the agents placed the cocaine in the trunk of a car in a parking lot. The agents hid the key on the car's left rear tire. The four defendants were arrested soon after taking the cocaine from the parked car.

On June 16, 1989, the four defendants arrived at the lot. Under surveillance, Palacio took the key from the car tire and then retrieved the cocaine from the car trunk. Franco, Palacio, and Arevalo left the scene in the their own car but they were soon stopped by local police who were signalled by the government agents conducting the surveillance. The police arrested those three defendants and proceeded to search the car. In the hatchback, they found a black bag that matched the description of the bag the agents used to return the nine kilos. The police opened the bag and found the cocaine. Rojo was arrested a short distance from the scene.

After their arrest, the defendants were brought to an Immigration and Naturalization Service ("INS") Detention Center. They arrived at the Center at 9:15 p.m. Only Franco's experience at the Center is relevant to this appeal. While Franco was in custody, at 11:00 p.m., an INS agent read Franco his *Miranda* warnings in Spanish. He was not questioned at that time and, therefore, made no statements.

* Of the District of Rhode Island, sitting by designation.

Almost an hour later, after his booking, Franco was again read his rights. He responded, as he had the first time, that he understood his rights. This time, however, he indicated that he was willing to speak with agents. The conversation between Franco and the agents took place in English. There did not appear to be any language barrier.

All four defendants were indicted on June 20, 1989, charged with possession of more than five kilos of cocaine with intent to distribute and with conspiracy to do so. Franco first appeared before the United States Magistrate on June 27, 1989 at which time he entered a plea of not guilty and requested that the hearing on the government's detention motion be continued until June 30, 1989. On June 30, Franco waived hearing and his detention was ordered. The other three defendants appeared on that same day and pled not guilty. Rojo was ordered detained. Arevalo and Palacio were detained on July 7 and July 21 respectively.

On July 12, 1989, Franco filed pre-trial motions to suppress evidence and statements and to sever. Additional motions were also filed by the other defendants and the government presented a consolidated response. Hearing on these motions was originally set down for September 29, 1989, but upon motion of one of the defendants, the hearing was postponed until October 4, 1989. After the hearing, on December 4, 1989, the U.S. Magistrate recommended denial of the suppression motions. Chief Judge Carter adopted the Magistrate's recommendation and granted Franco's motion to sever on January 10, 1990.

Juries for both trials were empaneled on April 10, 1990. During the selection process for the three unsevered defendants, one potential juror told the court during voir dire, in the presence of the venire, that she worked for the Department of Corrections with juvenile sex offenders. She stated that in her experience with juvenile sex offenders, the victims generally tell the truth while the sex offenders "do not own up to what they've done," even after they have been through the court system. Rojo

and Arevalo objected, contending that the other jurors would be biased by her comment that "defendants do not tell the truth." They requested, therefore, that the entire venire be dismissed. Judge Carter denied their request stating that any taint could be cured by an appropriate instruction which he would give at defense counsel's request. No such request was ever made.

Franco's trial began on the day of the empanelment, April 10, 1990. During the course of the trial, Franco took the stand in his own defense. On cross examination, the prosecutor sought to question Franco regarding a photograph in his immigration file ("INS file"). The photograph on file was not that of the defendant. Franco objected on the ground that questioning regarding the photograph was tantamount to the use of extrinsic evidence to prove bad acts in violation of Fed.R.Evid. 608(b). The photograph was never shown to, nor identified for, the jury as part of Franco's INS file. Judge Carter overruled Franco's objection finding that the government offered the photograph to show consciousness of guilt, not solely to impeach Franco's testimony. On April 12, 1990, the jury returned a verdict of guilty.

Franco's Presentence Report ("PSR") established a base offense level of 34. The level reflected negotiations for thirty kilos of cocaine with the agents. The base level was increased four levels, to 38, due to Franco's leadership role in the conspiracy. Most significantly, Franco received an additional two level increase, to 40, for obstruction of justice. The obstruction of justice increase suggested by the PSR was based on questions regarding Franco's identity. The fingerprints and photograph in the INS file of "Adalberto Franco–Montoya" were not a match with the defendant. Moreover, the passport that Franco submitted to the authorities in support of his claim that he was indeed "Franco" had been altered.

Having once come to light at his trial, the issue of Franco's identity was further explored at his sentencing hearing which began on September 14, 1990. To show that

Franco had attempted to use a false identity, the government presented the photographs and fingerprints in the INS file and proved that they did not belong to the defendant. In addition, a government agent testified that the passport offered by the defendant was significantly altered and was actually two passports made into one. The agent, who had interviewed Franco did admit, however, that if the defendant was not Franco, "he is one of the best coached false claims I have ever come up against."

The defendant put his wife and sister on the stand and they testified that defendant was "Franco" and that they did not recognize the photograph in the INS file. Franco, himself, took the stand to explain the discrepancies.[1] He said that when he married and, thereby, became eligible for a green card, he would have had to go back to Colombia for an extended period in order to obtain a visa. Because he did not wish to be away from his business for so long, he hired a "stand-in" to process the papers in Colombia. Presumably, that stand-in is the person depicted in the INS file. Franco then testified that his passport was altered because, on a later trip to Colombia, he discovered, when he attempted to leave the country, that his passport had expired. He did not want to wait the ninety days that it would take to get a new passport. A friend, therefore, back-dated the passport and glued in a new front page.

Judge Carter found that the offense level of 40 suggested by the PSR was correct. The court concluded that the two level increase for obstruction of justice was warranted by Franco's submission of the altered passport. He also made specific findings with regard to the identity question. The court refused to credit the testimony of Franco's witnesses and found that the defendant was not the "Adalberto Franco-Montoya" identified in the INS file. On September 21, 1990, Franco was sentenced to 365 months, the maximum for his range.

The trial of the three remaining defendants commenced on April 18, 1990. Palacio was the only defendant who took the stand in his defense. He testified that he met Franco when Franco brought a car into Palacio's auto repair shop in New York. Arevalo was, at that time, Palacio's assistant mechanic. According to Palacio, Franco asked them to take a trip to Boston with him to look at some cars. Later in his testimony, Palacio stated that he knew Franco was making the trip to get some money. Palacio further testified that he had never been to Boston. Therefore, when he was in Portland with Franco he assumed he was in Boston. Moreover, although Palacio admits that he retrieved the "black bag" from the car trunk, he claimed that he did not know that the bag contained cocaine. Throughout his testimony, Palacio denied that he knew the true nature of trip to Maine and the related events. All three defendants were found guilty on April 20, 1990.

PSRs were prepared for each of the three defendants. Rojo's PSR established a base level of 34 for his participation in a conspiracy involving 30 kilos of cocaine. Because he was a manager/supervisor in the conspiracy, three levels were added. Judge Carter accepted the offense level and on September 14, 1990, sentenced Rojo to 262 months, the top of the range. Arevalo's PSR recommended a base level of 32 based only on the nine kilos that he attempted to retrieve. Two levels were added for obstruction of justice. Arevalo used a false name to conceal the fact that there was an outstanding warrant for him in Virginia under his true name, Jose Luis Torres. Furthermore, Arevalo had attempted to destroy evidence by ripping pages from his address book and trying to flush them down the toilet during his detention in the INS Center. Judge Carter accepted the recommendations of the probation department and refused Arevalo's request for a downward adjustment for minor participation. Arevalo was sentenced on September 20, 1990 to the maximum for his range, 262 months. Palacio's PSR, like Arevalo's, calculated a base offense level of 32 for his involvement with

---

**1.** This was the first time since Franco's arrest that he had made any attempt to explain why the photograph and the fingerprints in the INS file were not his.

nine kilos of cocaine. He was given a two level increase for obstruction of justice due to his false testimony at trial. Judge Carter agreed with the probation department's evaluation and sentenced Palacio on September 19, 1990 to 169 months, a mid-range sentence.

All four defendants appealed on various issues. Franco raises five issues: 1) whether his rights were violated under the Speedy Trial Act; 2) whether the district court correctly determined that he was not, in fact, "Franco;" 3) whether the court erred in allowing extrinsic evidence of his identity to be introduced at trial; 4) whether his statements and the cocaine should have been suppressed and 5) whether the sentencing court relied improperly on unreliable hearsay evidence. Rojo presents three issues: 1) whether his rights were violated under the Speedy Trial Act; 2) whether the jury pool should have been discharged due to the comment of the juror regarding sex offenders; and 3) whether the district court properly applied the sentencing guidelines with regard to his role and the amount of cocaine. Arevalo raises five issues: 1) whether his rights were violated under the Speedy Trial Act; 2) whether the jury panel should have been dismissed; 3) whether the cocaine should have been suppressed; 4) whether the court erred in refusing to find that he had played a minor role in the conspiracy; and 5) whether the court erred by increasing his offense level for obstruction of justice. Finally, Palacio raises two issues: 1) whether the court erred by increasing his offense level for obstruction of justice and 2) whether the judge unfairly prejudiced the defendants when he instructed the jury that he was admitting hearsay because those statements were from a co-conspirator, implying that the judge believed a conspiracy existed.

### SPEEDY TRIAL ACT

Franco, Rojo and Arevalo claim that their cases should be dismissed because they were not brought to trial within the seventy days mandated by the Speedy Trial Act. *See* 18 U.S.C. § 3161. From the time that these defendants first appeared before the Magistrate until January 10, 1990, they had motions pending and, therefore, under the Speedy Trial Act, that time is excluded in calculating the seventy days. *See* 18 U.S.C. § 3161(h)(1)(F). On January 10, Franco was severed from the other defendants and therefore must be treated separately with regard to further speedy trial calculations. *See id.* at § 3161(h)(7).

### A. *Franco*

From January 10 until March 9, 1990, there were no motions pending in Franco's case; fifty-seven days passed on the speedy trial clock. On March 9, however, the government filed a motion *in limine* seeking rulings on evidentiary questions and seeking an order of trial with a second motion requesting permission to file a twenty-four page memorandum in support of its motion *in limine*. The district court entered a procedural order on March 12, 1990 setting Franco's trial for April 10, 1990; the trial of the other three defendants was to follow. On March 26, Franco filed a motion alleging a violation of the Speedy Trial Act. The district court denied Franco's motion on April 5. On the same day, the court allowed the government's twenty-four page memorandum but reserved ruling on the merits of the motion *in limine* until trial. Also on April 5, Franco filed two additional motions—one was withdrawn the next day; on the other, the court reserved ruling. On the following day, Franco filed and the court denied, another motion. Finally, the jury was empaneled on April 10, definitively stopping the speedy trial clock.

Franco contends that the government's motion of March 9, 1990 was not a motion that should stop the speedy trial clock and, moreover, that it was merely filed to circumvent the Act.

Under the Act, certain periods of delay are excluded including

"[a]ny period of delay resulting from other proceedings concerning the defendant, including but not limited to ... (F) delay resulting from any pretrial motion, from the filing of the motion to the conclusion of the hearing on, or other prompt dispo-

sition of, such motion; ... (J) delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court." 18 U.S.C. § 3161(h)(1)(F), (J).

The relationship between (F) and (J) was explained by the Supreme Court as follows:

> The phrase "prompt disposition" was intended to prevent a district court from using subsection (F) to exclude time after a motion is taken under advisement when that time fails to qualify for exclusion under subsection (J).
>
> Subsection (F), written in the disjunctive, excludes time in two situations. The first arises when a pretrial motion requires a hearing: subsection (F) on its face excludes the entire period between the filing of the motion and the conclusion of the hearing. The second situation concerns motions that require no hearing and that result in a "prompt disposition." There, the promptness requirement was "intended to provide a point at which time will cease to be excluded, where motions are decided on the papers without a hearing." The "point at which time will cease to be excluded" is identified by subsection (J), which permits an exclusion of 30 days from the time a motion is actually "under advisement by the court." ... "Indeed, if motions are so simple or routine that they do not require a hearing, necessary advisement time should be considerably less than 30 days." *Henderson v. U.S.*, 476 U.S. 321, 329 [106 S.Ct. 1871, 1876, 90 L.Ed.2d 299] (1986) (quoting S.Rep. No. 96–212 at 34 (1979)).

Franco contends that the government's motion *in limine* is not the sort of motion contemplated under (F) and, therefore, should not have stopped the clock. For this proposition, Franco relies primarily on *U.S. v. Rush*, 738 F.2d 497, 505–506 (1st Cir.1984), *cert. denied*, 470 U.S. 1004, 105 S.Ct. 1355, 84 L.Ed.2d 378 (1985). In *Rush* we held that an offer of proof does not stop the speedy trial clock because "it was not a pretrial motion within the meaning of" (F). *Id.* at 505. "Instead, it is a submission of evidence which need not be admitted or excluded until trial; indeed it is commonly carried over until trial. If such submissions were held to be pretrial motions ... the Speedy Trial Act could easily be circumvented by filing offers of proof at an early stage and then failing to press for prompt disposition." *Id.* at 505–06.

At first blush, this argument seems to have merit. However, *Rush* is not the last word on the treatment of motions under the Speedy Trial Act. The Supreme Court has stated that "[t]he provisions of the Act are designed to exclude all time that is consumed in placing the trial court in a position to *dispose* of a motion." *Henderson*, 476 U.S. at 331, 106 S.Ct. at 1877 (emphasis added). We do not believe that a court should put off consideration of a motion *and* exclude the time during which the motion lies dormant. However, when the court is presented with papers *styled* as a motion, whether it ultimately determines that the filing is a pretrial motion or an "other proceeding" under (J), the court is entitled to exclude at least the period of time during which it considers how to treat the filing. In this case, that period extended from March 9, 1990 until April 5, 1990 when the court announced its decision to reserve ruling on the motion *in limine*. Excluding this time, even if none of the motions later filed by defendant were pending, the jury would have been empaneled on the sixty-second day and the trial began in time.

There is, however, an additional reason not to follow *Rush* in this case. In *Rush*, the court deferred ruling for two and one half years and the parties did not press for disposition. 738 F.2d at 506. In the instant case, there was no such extraordinary time lapse or needless delay. The district court methodically disposed of motions as they were filed and moved the case along to trial. There were no untoward delays or gaps in the docket. Finally, there appears to be no evidence of pretextual filing on the part of the government.

### B. *Rojo and Arevalo*

After Franco was severed, forty-nine non-excludable days passed for the

other defendants. Then, on March 1, 1990, Palacio filed a Speedy Trial Act motion stopping the clock for all three defendants. *See* 18 U.S.C. § 3161(h)(7). Eight days later, Palacio filed a "Notice of Withdrawal" purporting to withdraw his motion without prejudice. On the same day, the government filed the motion *in limine* discussed above. The court ruled, on March 23, that it was denying Palacio permission to withdraw his Speedy Trial Act motion *without* prejudice and that the court would rule on that motion on March 30 unless that motion was withdrawn *with* prejudice. Instead of ruling on March 30, the court denied Palacio's motion on April 5—the same day that it specifically reserved ruling on the government's motion *in limine*. Rojo filed a Speedy Trial Act motion on April 9th.

These defendants contend that they did not need the court's permission to withdraw the motion and that, therefore, the Speedy Trial clock should have started running on March 9, the day the Notice of Withdrawal was filed. In addition, they agree with Franco that the government's motion *in limine* did not stop the clock. They argue that the clock began running on March 9 and thus eighty days passed before Rojo's motion next stopped the clock. Because we have already decided that the government's motion *did* stop the clock from March 9, the day Palacio attempted to withdraw his motion, until April 5, there is no need to reach the question of whether Palacio's Speedy Trial Act motion was indeed withdrawn. Assuming *arguendo* that Palacio's motion was withdrawn on March 9, only fifty-three days passed for speedy trial purposes, excluding the time that the government's motion *in limine* was under advisement. Rojo and Arevalo, like Franco, were brought to trial in time.

## PALACIO: OBSTRUCTION OF JUSTICE

Palacio contests the sentence imposed by Judge Carter. He contends that the two-level enhancement for obstruction of justice was in error. His argument is two-pronged. He first asserts that if his behavior warrants any enhanced sentence, it must be based on the Comment to Guideline 3C1.1 as amended in 1990. That amendment provides that an enhancement for obstruction of justice may be applied for "committing, suborning, or attempting to suborn perjury." United States Sentencing Commission, *Guidelines Manual*, § 3C1.1, comment (n.3(b)) (Nov.1990). The prior comment allowed enhancement for "testifying untruthfully ... concerning a material fact." U.S.S.G. § 3C1.1, comment (n. 1) (November 1989). Assuming that the amended version applies, Palacio then contends that the amendment was meant to "clarify" the standard and that the implication of the use of the term "perjury" is that specific proof is now required. "Testifying untruthfully," according to Palacio, was more readily shown. We are not persuaded by this argument.

It has long been the case that "in fixing a defendant's sentence, [a court] could take into account false swearing by the defendant at trial." *U.S. v. Akitoye*, 923 F.2d 221, 228 (1st Cir.1991) (citing *U.S. v. Grayson*, 438 U.S. 41, 52–53, 98 S.Ct. 2610, 2616–17, 57 L.Ed.2d 582 (1977)). We have conclusively put to rest the related argument made by Palacio that his sixth amendment rights are "chilled" by use of such an enhancement. *Id.; see also U.S. v. Acosta–Cazares*, 878 F.2d 945, 953 (6th Cir.) ("no constitutional right to testify untruthfully"), *cert. denied*, 493 U.S. 899, 110 S.Ct. 255, 107 L.Ed.2d 204 (1989).

Regarding the applicability of the 1990 amendment, Palacio was sentenced in September 1990; the amendment did not take effect until November 1, 1990 and thus, should not apply to his sentencing. *See U.S. v. Alvarez*, 927 F.2d 300, 302 n. 1 (6th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 2246, 114 L.Ed.2d 487 (1991). Whether the amendment does or does not apply to Palacio is, however, not dispositive because the distinction defendant attempts to draw between "perjury" and "testifying untruthfully" is a distinction without a difference. *See U.S. v. Marino*, 936 F.2d 23, 31 n. 12 (1st Cir.1991) ("We decline to accord the word 'perjury' talismanic significance, and find it evident that the district court found [defendant] to have testified falsely...."); *Akitoye*, 923 F.2d at 228 (" 'committing ...

perjury' or 'testifying untruthfully ... concerning a material fact' can trigger an upward adjustment under the guidelines"). Moreover, the level of proof required for a conviction for the crime of perjury is not the same level that applies to sentencing proceedings. "The preponderance of the evidence standard applies to contested facts in" sentencing proceedings. *U.S. v. Silverman*, 889 F.2d 1531, 1535 (6th Cir. 1989). The government, however, has the burden of proof with regard to the establishment of enhancement factors, *id.*, and had to prove, by a preponderance, to the district court's satisfaction, that Palacio lied under oath.[2]

 We must accord "considerable deference" to the sentencing court's application of the guidelines. *U.S. v. Martinez*, 922 F.2d 914, 925 (1st Cir.1991). "Due deference in this context means that, absent mistake of law, we will review the sentencing court's fact-based application of the guidelines only for clear error." *Id.* Our review of legal questions, however, is plenary. *U.S. v. Williams*, 891 F.2d 962, 964 (1st Cir.1989).

At Palacio's sentencing hearing on September 19, 1990, Judge Carter accepted the facts as set out in the PSR, stating:

> The Court is satisfied that the facts are as stated by a preponderance, ... in fact in almost every single respect the Court is satisfied that the jury verdict indicates those facts were established beyond a reasonable doubt to the satisfaction of the jury. For purposes of sentencing it is clear by a preponderance of the evidence they are accurately stated. (T. 9/19/90 at 35).

With regard to the obstruction of justice enhancement, the Court continued:

> [I] heard the testimony of this defendant and I have great concern in applying the ... enhancement of the offense level for wilfully obstructing or impeding the proceedings under 3C1.[1] because of my concern that too easy application of that

would chill the right under the constitution of a defendant to take the stand and testify in his own defense. And I have firmly in mind the application notes 2 and 3 to that section of the guidelines pointed out to me by defense counsel. And I can say in evaluating this defendant's testimony at trial in the light most favorable to this defendant and still giving reasonable construction to the greater weight of the evidence in the case, that I am satisfied that his testimony was knowingly untruthful and that it was given in the face of clear weight of all of the other evidence in the case in an effort to extricate him from a conviction in this case, and done deliberately for that purpose and as such it does constitute, in the view of this Court, wilful obstructing of justice and I conclude, therefore, that a two-level increase to the Base Offense Level pursuant to section 3C1.1 for Obstruction of Justice by reason of his false testimony at trial is appropriate and indeed required. (T. 9/19/90 at 35–36).

Finally, at a later point in the hearing, the Court stated: "it is my conclusion that [the defendant] has committed *perjury* in his testimony in the trial of this case." (T. 9/19/90 at 53) (emphasis added).

Giving due deference to Judge Carter's finding that Palacio perjured himself and, therefore, deserved the enhancement, we find that although the district judge did not identify the specific perjurious statements, "this omission does not preclude affirmance of its finding in an instance where, as here, the record speaks eloquently for itself." *Akitoye*, 923 F.2d at 229. Looking at the record, Judge Carter was clearly justified in his finding. Palacio not only contended that he was not aware that he was in Maine (thinking all the time that he was in Boston, Massachusetts), but he also contended that he spent the entire day of the arrest in a motel room watching television when, in fact, he was spotted elsewhere. Moreover, he asserted that he never knew the true nature of the journey and

---

**2.** At Palacio's sentencing hearing, the government presented one witness and relied in their argument primarily on the evidence presented at the trial. Palacio implies that the government had a duty to "retry" the case at sentencing in order to meet their burden of proof. We find this argument to be wholly lacking in merit.

he never questioned anything that occurred—even when he was instructed to retrieve a black bag from the trunk of a parked car with a key that he obtained from the car's rear tire. " 'The law is not so struthious as to compel a judge, in making factbound determinations under the sentencing guidelines, to divorce himself or herself from common sense or to ignore what is perfectly obvious.' " *Id.* (quoting *U.S. v. Sklar,* 920 F.2d 107, 112 (1st Cir. 1990)).

◼ Palacio also points out that, pursuant to application note 1 of § 3C1.1, "the defendant's testimony and statements should be evaluated in a light most favorable to the defendant." His contention is that we must construe all testimony in his favor without any regard to Judge Carter's evaluation of the credibility of the witnesses. The cautionary note, however, "does not mandate the resolution of every conflict in testimony in favor of the defendant; rather, it 'simply instructs the sentencing judge to resolve in favor of the defendant those conflicts about which the judge, after weighing the evidence, has no firm conviction.' " *U.S. v. Wallace,* 904 F.2d 603, 605 (11th Cir.1990) (quoting *U.S. v. Franco–Torres,* 869 F.2d 797, 800 (5th Cir.1989)). As noted, *supra,* Judge Carter specifically stated that he considered Palacio's testimony in the most favorable light. On the basis of the record, we see no reason to disturb his findings and we, therefore, affirm Palacio's sentence.

### FRANCO'S IDENTITY: *Obstruction of Justice Enhancement*

◼ Franco received a two-level enhancement of his sentence pursuant to guideline § 3C1.1 for obstruction of justice. Franco contends that the government did not meet its burden of proving that he had assumed a false identity and that, therefore, the sentencing court abused its discretion. His argument, however, is unavailing.

The basic flaw in Franco's argument is that the sentencing court did not rely on the "identity issue" for the two-level enhancement. As the Memorandum of Sentencing Judgment and the sentencing hearing transcript make clear, the judge relied on the fact that Franco had submitted an altered passport as verification of his identity. (T. 9/21/90 at 266). This conduct clearly allows for such an enhancement. The Commentary to § 3C1.1 states that "producing or attempting to produce an altered, forged, or counterfeit document or record during a preliminary or grand jury proceeding, trial, sentencing proceeding, or any other judicial proceeding" is a basis for an obstruction of justice enhancement. U.S.S.G. § 3C1.1, comment (n. 1(c)) (Nov. 1989). Even Franco admitted that the passport was altered. There is no question that under the standard of review set forth *supra,* the sentencing judge's enhancement for obstruction of justice must be affirmed.

◼ Franco also challenges the district court's reliance on his alleged false identity in determining the appropriate sentence within the guideline range. Franco stresses that the government did not prove that he was not "Franco." The sentencing court, however, decided only that the defendant was not the Adalberto Franco–Montoya depicted by the photographs and fingerprints in the INS file. This specific finding was not used to support the enhancement but only considered in imposing the specific sentence within the prescribed range. The guidelines make clear that a sentencing "court may consider, without limitation, any information concerning the background, character and conduct of the defendant unless otherwise prohibited by law." U.S.S.G. § 1B1.4. Franco admits that the photograph and the fingerprints belong to someone he hired to impersonate him. This deception was certainly conduct that the court was entitled to consider.[3]

### FRANCO'S IDENTITY: *Extrinsic Evidence*

◼ Outside of the sentencing context, Franco alleges that the introduction of the INS file during his cross-examination con-

---

**3.** In sentencing Franco, the court also considered the fact that Franco operated under the assumed name, "Nelson," for the cocaine trans-

action and that he directed others to hold Rojo's wife and an unindicted co-conspirator's family as "collateral" for cocaine payments.

stituted extrinsic evidence that was improperly admitted pursuant to Fed.R.Evid. 608(b).[4] Again, Franco's argument misses the mark. When Judge Carter overruled Franco's objection he made it clear that Rule 608 was not in issue. He stated that although the file "may have [the] incidental effects of ... questioning his credibility, ... the purpose for which it is offered, as I understand it, is to show he has a consciousness of guilt." (T. 4/11/90 at 251–52); *see U.S. v. Grandmont,* 680 F.2d 867, 869 (1st Cir.1982) ("It is well established that ... concealment or falsification of identity may be admitted at trial as bearing upon the guilt of the accused, so long as there is an adequate factual predicate.")[5] Moreover, the "evidence" was never actually identified for the jury, shown to the jury or moved into evidence. In fact, even the questioning relating to the INS file was limited to one question:

> Q: Let me show you what has been marked Government Exhibit 13, and I ask you if you recognize that person in the exhibit?
>
> A: (Mrs. O'Leary interpreting). I have no idea who he is.

(T. 4/11/90 at 252). Due to the *de minimis* nature of the exchange, whether the evidence should have come in or not is a question that is practically meaningless. The effect on the defendant's trial was harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 22–23, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967).

## OTHER ISSUES

The remaining issues raised by the four defendants do not warrant any extensive discussion. We affirm on all the issues and can dispose of them briefly.

### A. *Juror Comment*

▮ Rojo and Arevalo objected to the potential juror's comment about sex of-

fenders, claiming that the venire should have been dismissed because of the prejudicial remark. Their argument, however, is unavailing. Contrary to the defendants' assertion, the juror's statement only referred to juvenile sex offenders, not to all criminal defendants. The judge questioned the jurors as to their impartiality. Moreover, upon objection, the district court offered to give a special limiting instruction if defense counsel so requested. Counsel never made such request. We, therefore, find that the district court did not abuse its discretion in refusing to dismiss the jury panel. *See U.S. v. Dennis,* 786 F.2d 1029, 1043–44 (11th Cir.1986), *cert. denied,* 481 U.S. 1037, 107 S.Ct. 1973, 1974, 95 L.Ed.2d 814 (1987).

### B. *Suppression Motions*

▮ Franco and Arevalo challenge the court's denial of their suppression motions. Together they contest the admission of the seized cocaine; Franco alone challenges the admission of his post-arrest statements. The seizure of the cocaine from the bag located in the hatch of the defendants' car is justified on two grounds. First, under *New York v. Belton,* 453 U.S. 454, 460 & n. 4, 101 S.Ct. 2860, 2864 & n. 4, 69 L.Ed.2d 768 (1981), police may, incident to a lawful arrest, open containers found in the passenger compartment of a car. Because the hatch area was within defendants' reach, the seizure of the cocaine was constitutional. Second, under the recently decided *California v. Acevedo,* — U.S. ——, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991), the Supreme Court held that the automobile exception to the warrant requirement allowed police to open even containers found in the trunk of a car.

As to Franco's statements, they were made after he was twice given his *Miranda* warnings. The district court's finding that Franco voluntarily, knowingly, and

---

**4.** Fed.R.Evid. 608(b) states in part: "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility ... may not be proved by extrinsic evidence."

**5.** At the time of trial, the court and prosecution believed that Franco was using a false name.

Franco later provided an explanation for the photographs and fingerprints in the INS file. Because Franco concealed this explanation until the sentencing hearing, the district court was justified in believing that he was concealing his true identity.

intelligently waived his rights is not clearly erroneous. *See U.S. v. Baldacchino,* 762 F.2d 170, 178–79 (1st Cir.1985).

### C. *Franco's Hearsay Argument*

 Franco contends that the district court improperly relied on the untrustworthy hearsay testimony of a government agent in his sentencing determination. Under the guidelines, "the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a); *see U.S. v. Wright,* 873 F.2d 437, 441 (1st Cir.1989). The reliability of the evidence may be established by corroboration. *See U.S. v. Fatico,* 603 F.2d 1053, 1056–57 (2d Cir.1979), *cert. denied,* 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980) (pre-guidelines case holding that out-of-court statements of unidentified informant admissible for sentencing). All of the evidence presented at the sentencing hearing by the government agent was corroborated by evidence admitted at trial, under oath and subject to cross-examination. The district court's findings are, therefore, not clear error.

### D. *Jury Instructions on Co–Conspirator Hearsay*

 Palacio argues that the district court's instructions to the jury when it admitted certain co-conspirator hearsay statements was prejudicial. After Palacio's counsel objected, the court issued a second instruction. Upon the court's inquiry, defense counsel indicated he was satisfied with the second instruction. Palacio has, therefore, waived this issue on appeal. *See U.S. v. Ruiz–Garcia,* 886 F.2d 474, 476 (1st Cir.1989).

### E. *Arevalo's Obstruction of Justice Enhancement*

 Arevalo contends that the two-level enhancement of his sentence for obstruction of justice was in error. The court relied on two bases: the defendant's use of a false identity to avoid an outstanding warrant under his true name and the defendant's attempted destruction of material evidence, namely, his address book. Arevalo makes much of the fact that the district court never specifically found that the contents of the address book were material evidence. This is, however, of no consequence as the district court could rely solely on use of the false identity for the enhancement. *See U.S. v. Mata–Grullon,* 887 F.2d 23, 24 (1st Cir.1989).

### F. *Rojo's and Arevalo's Roles in the Conspiracy*

 Rojo and Arevalo each contend that the district court erred in its determination as to their roles in the conspiracy. Rojo argues that he was not a manager/supervisor and Arevalo argues that he should have been given minor participant status. The sentencing court's findings are supported by the record and do not constitute clear error. *See Wright,* 873 F.2d at 444.

### CONCLUSION

We affirm the district court on all the issues raised by the four defendants.

AFFIRMED.