**UNITED STATES of America, Appellee,**

v.

**Robert ARCHIBALD, Appellant.**

**No. 863, Docket 83–1356.**

United States Court of Appeals, Second Circuit.

Argued March 1, 1984.

Decided May 16, 1984.

Nanette Dembitz, New York City, for appellant.

Mark R. Hellerer, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., S.Dist.N.Y., Barry A. Bohrer, Asst. U.S. Atty., New York City, of counsel), for appellee.

Before KAUFMAN, OAKES and WINTER, Circuit Judges.

OAKES, Circuit Judge:

We have previously emphasized the importance of ensuring fairness in eyewitness identification testimony. *E.g., Kampshoff v. Smith*, 698 F.2d 581, 585–86 (2d Cir. 1983). Here, as in numerous other bank robbery prosecutions, the case principally turns on such testimony. The defendant argues that the photographic array presented to three eyewitnesses was unduly suggestive, an argument which we do not find persuasive. He also maintains that the in-court identification by these witnesses took place in impermissibly suggestive circumstances, an argument which we do find persuasive. The ultimate question is whether the erroneous admission of the in-court identification testimony was harmless in the light of the permissible photographic identification testimony, coupled with the clear surveillance photographs admitted in evidence. We find that it was. Accordingly, we affirm the judgment of conviction in the United States District Court for the Southern District of New York, Thomas P. Griesa, Judge.

## FACTS

On October 23, 1981, at approximately 9 a.m., the West Side Federal Savings and Loan Association, at 30 East 42nd Street, New York, New York, was robbed by three black males. One of the robbers stood at the door pointing a sawed-off shotgun. Another roamed the lobby carrying a small revolver. The third robber, carrying a revolver and a duffle bag, hurdled the counter to the tellers' area and took money from each of the four tellers' stations and put it in his bag. He then vaulted back over the counter and the three robbers left with approximately $15,800 of federally insured bank money. Bank surveillance cameras recorded the incident, and a number of tellers observed the robbery in progress.

Some twenty months later, after two of the robbers had been apprehended and pleaded guilty to the bank robbery, three different tellers identified a photograph of the defendant, Robert Archibald, in an array of mugshots. Teller Carl Jenkins, who at one point was but inches away from the robber who hurdled the counter, identified Archibald from the photo spread, saying that he "looks like the man." Teller Evrit Jackson also did so, stating, "I believe this is the man that is the vaulter." Teller Dawn Krowl, who made careful observations of the robbers, said that Archibald's photograph "looks like the man that vaulted the counter." Each of the witnesses indicated that the vaulter's hair at the time of the robbery was in braids, pushed back and under a hat, and that he did not have a moustache, a description corroborated by surveillance photos. During the trial, Archibald's hair was "pushed back" in Krowl's words, but not braided, and he had a moustache.

At trial Archibald called Ricky Roberts and Wilson Sumbry, who had previously pleaded guilty to the robbery. Roberts testified that he and Sumbry had robbed the bank with a third man whom he had met only a few minutes before the robbery.

Although he stated that he could not identify the man, when defense counsel presented him with the same photo array given the bank tellers, Roberts identified Archibald's picture as that of the third robber.

Sumbry testified that Archibald was not the third robber. On cross-examination, he denied that he had identified Archibald's picture in the photo array and denied further that it was his signature which appeared on the back of Archibald's mugshot confirming such identification.

## DISCUSSION

■ Archibald raises two principal arguments on this appeal. First, he claims that the photographic array from which the tellers identified his mugshot was unduly suggestive. Although it contained photos of six black men who bore certain resemblances to one another, the mugshot of Archibald was the only one that showed that he was arrested in the Borough of Manhattan. He also objects that his was the only photograph of an individual who looked as though he had braided hair. Second, Archibald claims that the in-court identifications were tainted by unduly suggestive circumstances, namely, that throughout the trial he was the only black person in the courtroom, except for one day when a black United States Marshal was present, and that he was seated at the defense table. In addition, he raises objections to the court's charge and sentence. We discuss these contentions in turn.

This court has examined the photo spread presented to the bank tellers. Each man was wearing an identification plate showing the date and borough of his arrest, but the legends are not unduly prominent. Each is a black male who appears to be in his twenties. Each has facial hair and is about the same weight and color of skin. The district court concluded that the array was "a remarkably fair group of photographs" and we do not disagree with the conclusion. The differences between

Archibald's photograph and the other mugshots would hardly suggest to an identifying witness that Archibald was more likely to be the culprit. *See United States v. Magnotti*, 454 F.2d 1140, 1141–42 (2d Cir. 1972).

Archibald argues that the array was unduly suggestive because the caption on his mugshot "identif[ied] him with criminality in Manhattan." This argument is without merit. Given that the caption is so insignificant, and the boroughs listed on the other mugshots are all immediately adjacent to Manhattan, it is highly improbable that the caption could have caused any of the bank tellers to choose Archibald's photo over the others. Indeed, despite the fairness of the photo spread, Archibald's mugshot looks much more like the vaulter depicted in the surveillance photos than any of the others do.[1] We conclude that the photo spread was not impermissibly suggestive. *See United States v. Bubar*, 567 F.2d 192, 198–99 (2d Cir.), *cert. denied*, 434 U.S. 872, 98 S.Ct. 217, 54 L.Ed.2d 151 (1977).

If not impermissibly suggestive, however, the photo array was certainly unnecessarily so. It would have been a simple matter to cut out the identifying captions before displaying the photos to the witnesses; indeed, this is precisely what was done before submitting the photos to the jury. Thus, although we conclude that the use of captioned photographs did not amount to constitutional error, it surely was poor prosecutorial practice.

Nor was Archibald deprived of due process by the district court's exercise of its discretion in *not* holding a pretrial hearing on the issue of suggestiveness. No per se rule requires such a hearing, *Watkins v. Sowders*, 449 U.S. 341, 346–47, 101 S.Ct. 654, 657–658, 66 L.Ed.2d 549 (1981), and we believe that the trial court was within its allowable range of discretion in leaving the trustworthiness of the evidence to the "time-honored process of cross-examination ...." *Id.* at 349, 101 S.Ct. at 659. We

---

**1.** We also note that the jury had before it both the photo array and the surveillance photos, including enlargements of some of the latter.

think it would have been preferable, however, had the district court conducted a pretrial hearing on this issue. *See United States v. Leonardi,* 623 F.2d 746, 755 (2d Cir.), *cert. denied,* 447 U.S. 928, 100 S.Ct. 3027, 65 L.Ed. 1123 (1980).

Since the pretrial identification procedures were not impermissibly suggestive, we need not here reach the question whether, under the totality of the circumstances, there was a very substantial likelihood of irreparable misidentification. *See Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); *Styers v. Smith,* 659 F.2d 293, 297 (2d Cir.1981). We note, however, that the eyewitness testimony and the surveillance photos show a totality of circumstances unlikely to result in misidentification. As Archibald concedes, the lighting inside the bank was good. The vaulter stood next to the tellers, in plain view, as he emptied cash from the drawers. He called attention to himself as he jumped over the counter twice during the robbery. Tellers Krowl and Jenkins paid especially close attention to the vaulter, as the surveillance photos bear out, especially in Jenkins' case. Moreover, even before they were shown the photo array, the eyewitnesses' descriptions of the robber matched Archibald rather well. Finally, the eyewitnesses had a relatively high level of certainty in making their identifications. *Manson v. Brathwaite,* 432 U.S. at 114–15, 97 S.Ct. at 2253.

The in-court identifications present us with a different problem. As is generally the case, the defendant here was seated next to defense counsel during the trial, a circumstance obviously suggestive to witnesses asked to make in-court identifications. Any witness, especially one who has watched trials on television, can determine which of the individuals in the courtroom is the defendant, which is the defense lawyer, and which is the prosecutor. In most cases, however, no objection is made to the fact that an identification occurs while the defendant is seated with defense counsel, probably because this arrangement is traditional.

Here, however, the defendant himself recognized that there was a problem of suggestiveness and asked his lawyer to bring the problem to the attention of the court. Before commencement of the trial, the defendant requested a corporeal lineup. He told counsel that he did not want to sit at the counsel's table, but wanted to be seated with five or six other black men who looked reasonably like him, to ensure that he would not be obviously singled out by an educated witness. This request was relayed to the judge's law clerk, who in turn conveyed it to the court, which did not make a pretrial ruling. After the direct testimony of the first bank teller witness, defense counsel renewed his request. The judge, denied it, stating: "I do not think it can be considered a valid request.... I certainly do not think that [it] is practical, anyway." Later in the case, the judge stated: "This is not a lineup. This is a trial. And that request is just absolutely inappropriate. And we have no—the court has no obligation, nor does the government have any obligation, nor does defense counsel have any obligation, to stage a lineup here. This isn't the place for a lineup. And this is a trial."

The judge below did not fully appreciate the concern that this court had shown with in-court identification procedures. We may agree with the court that there was no obligation to stage a lineup, but there was, however, an obligation to ensure that the in-court procedure here did not simply "amount[ ] to a 'show-up.'" *United States v. Kaylor,* 491 F.2d 1127, 1131 (2d Cir. 1973), *vacated on other grounds sub nom. United States v. Hopkins,* 418 U.S. 909, 94 S.Ct. 3201, 41 L.Ed.2d 1155 (1974).

Our concern with suggestive in-court identification procedures has been noted in a number of cases. In *United States v. Ravich,* 421 F.2d 1196, 1202 (2d Cir.), *cert. denied,* 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970), during eyewitness testimony at a pretrial hearing on identification procedure, the prosecutor suggested that the defendants absent themselves. While they did not do so, they did "move from the

counsel table to less conspicuous positions in the courtroom," where they were identified nevertheless. In *United States ex rel. Phipps v. Follette*, 428 F.2d 912, 915 (2d Cir.) *cert. denied*, 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970), citing *Foster v. California*, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969), Judge Friendly ventured that "there is always the question how far in-court identification is affected by the witness' observing the defendant at the counsel table." In *Kaylor*, we held that identification testimony that amounted to a "show-up" was not per se inadmissible, but rather depended upon the "totality of the circumstances." 491 F.2d at 1131, citing *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). We held that identification by a witness who returned to the stand to make an identification that he had not made during earlier testimony was not reversible error, at least in the absence of any suggestion that the prosecution was purposely or in bad faith attempting to bring the confrontation about in the fashion that it occurred. In *Brathwaite v. Manson*, 527 F.2d 363, 367 (2d Cir.1975), *rev'd on other grounds*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), Judge Friendly, in dictum, calls attention to the "perfunctory type of identification where the defendant is sitting at the counsel table...." *Id.* at 367 n. 6. The opinion says that "indeed it would seem that only the apparent weakness of this kind of identification, along with its traditional character, saves it from condemnation as being itself impermissibly suggestive." *Id.* In *Boyd v. Henderson*, 555 F.2d 56, 61–62 (2d Cir. 1977), an in-court identification based on an impermissibly suggestive initial confrontation at a *Wade* hearing (*see United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967)) was held to be harmless error, even though the *Wade* confrontation was suggestive because the witness's identification occurred "while petitioner was the only black male and the only defendant in the courtroom."

Perhaps the case which has considered the question most carefully in this circuit is *United States v. Brown*, 699 F.2d 585,

593–94 (2d Cir.1983). In *Brown*, there was no pretrial lineup. The defendants were alerted a week prior to trial that there had also been no selection from a photo spread, and that an eyewitness was expected to make a positive identification in court at trial. The defendants failed to request a lineup or any other protective procedure, "such as having the defendants sit in the audience among other individuals of the same general appearance, or having federal employees who fit their description sit near them at the defense table." 699 F.2d at 593. In light of these circumstances, Judge Mansfield's opinion for the majority held that the in-court identification was not a violation of the defendant's rights or abuse of discretion by the trial judge. The court alerted the district courts of this circuit to the proposition that

when a defendant is sufficiently aware in advance that identification testimony will be presented at trial and fears irreparable suggestivity, as was the case here, his remedy is to move for a line-up order to assure that the identification witness will first view the suspect with others of like description rather than in the courtroom sitting alone at the defense table. *Id.* at 594.

Archibald did not exactly seek the remedy prescribed in *Brown*. Instead, he waited until the moment before trial to request that he be seated away from the defense table and that other black men be seated in the courtroom. Nevertheless, in light of *Brown* and the other cases noted herein, his request should not have been dismissed so quickly or so absolutely by the trial court. A fairly short delay of proceedings was all that would have been required to rearrange the seating in the courtroom and to secure the presence of some people of the defendant's approximate age and skin color. While it was not necessary for the court to conduct a true *Wade*-type of lineup, these relatively minor steps were required to ensure that the identification was not unfair. The in-court identification procedure utilized here was so clearly suggestive as to be impermissi-

ble, however traditional it may be. *But cf. United States ex rel. Clark v. Fike*, 538 F.2d 750, 755 (7th Cir.1976) (no in-court lineup required), *cert. denied*, 429 U.S. 1064, 97 S.Ct. 791, 50 L.Ed.2d 781 (1977); *United States v. Edward*, 439 F.2d 150 (3d Cir.1971) (no abuse of discretion to refuse defendant's request to sit among spectators during identification).

The request made in this case, therefore, was not "just absolutely inappropriate," as the district court stated.[2] Indeed, the suggestiveness of the situation was clearly indicated at trial. One of the three witnesses who identified Archibald stated on cross-examination that she "had the feeling that he would be sitting next to" the defense lawyer in the courtroom. It was an obviously suggestive situation.

Having said that, however, the question remains whether the error was harmless. When the array with the photo of Archibald is compared to the surveillance photos, it is clear that the photographic identification testimony alone could have supported the conviction. *United States v. Magnotti*, 454 F.2d 1140. Even though there was a considerable lapse of time between the robbery and the photographic identifications, the witnesses had ample opportunity to observe the robbers, and we have no doubt but that their identifications would have served to convict Archibald. In addition, however, there is the fact that the two other bank robbers, when shown the photographic array by the FBI agents, picked out Archibald as the man who had vaulted the tellers' counter. One of them also signed the back of the photograph confirming the identification, an identification which, to be sure, he denied at Archibald's trial. Thus, this is not a case like *Kampshoff v. Smith*, 698 F.2d 581 (2d Cir.1983), where the only eyewitness identification

testimony was impermissibly suggestive. *Cf. Boyd v. Henderson*, 555 F.2d 56, 62 (2d Cir.) (impermissible identification is harmless error where other evidence supports conviction), *cert. denied*, 434 U.S. 927, 98 S.Ct. 410, 54 L.Ed.2d 286 (1977).

Archibald also argues that the court's charge to the jury was erroneous and that the court improperly denied him young adult offender status in imposing a fifteen-year sentence. With respect to the charge, he claims that the court failed to instruct the jury that, in order to convict him under 18 U.S.C. § 2113(d) (1982), it must at least infer that one or more of the guns used during the bank robbery was loaded and therefore was objectively capable of inflicting severe injury. In addition, he contends that the judge on several occasions stated that section 2113(d) required an assault "or" putting life in jeopardy, although the indictment read in the conjunctive.

■ The charge, however, was proper under *United States v. McAvoy*, 574 F.2d 718, 720–22 (2d Cir.1978), which held that "the pointing of a gun does permit the inference of objective capability," *id.* at 722, and that "absent a showing that the guns used in the robbery were unloaded, it [is] unnecessary to establish that the guns used by the robbers were actually loaded if there was a threat to use them." *Id.* at 720–21. The judge's charge was well within the *McAvoy* rule: "jeopardy of life, risk of death or bodily injury, that, of course involves something more than perhaps, you know, a weak fist. The idea is the use of some weapon which does have the ability to inflict death or serious bodily harm." Any error in respect to using the alternative rather than the conjunctive in defining as-

---

**2.** This court in the past has suggested the availability of in-court lineups in a variety of situations. *See, e.g., United States v. Estremera*, 531 F.2d 1103, 1111–12 (2d Cir.) ("The motion ... for a pretrial line-up might well have been granted by the trial judge as a matter of convenience, since appellant could probably have obtained the equivalent of such a line-up when the witnesses later made their in-court identifica-

tions."), *cert. denied*, 425 U.S. 979, 96 S.Ct. 2184, 48 L.Ed.2d 804 (1976); *United States v. Campbell*, 581 F.2d 22, 28 (2d Cir.1978) ("Although [defense] counsel objected to the in-court identification, he did not request that [the defendant] be accorded at trial the equivalent of a line-up, in or out of the jury's presence, which Judge Pierce would probably have granted.").

sault was surely cured by the court's statement that "if someone comes into a situation with a weapon and threatens the use of it and does so in a way to indicate that he has the ability to commit this harm ... then that is assault."

 In respect to the denial of young adult offender status [3] to Archibald, *Dorszynski v. United States*, 418 U.S. 424, 443, 94 S.Ct. 3042, 3053, 41 L.Ed.2d 855 (1974), has long since taught us that "[o]nce it is made clear that the sentencing judge has considered the option of treatment under the Act and rejected it ... no appellate review is warranted." Here the judge specifically found that Archibald would not benefit from treatment as a young adult offender, remarking that this "is a case of a most serious crime committed by someone with a substantial criminal background."

For the foregoing reasons, we affirm the judgment of the district court.[4]

---

**3.** Eligibility for youth offender status is defined as follows:

In the case of a defendant who has attained his twenty-second birthday but has not attained his twenty-sixth birthday at the time of conviction, if, after taking into consideration the previous record of the defendant as to delinquency or criminal experience, his social background, capabilities, mental and physical health, and such other factors as may be considered pertinent, the court finds that there are reasonable grounds to believe that the defendant will benefit from the treatment provided under the Federal Youth Corrections Act (18 U.S.C., chap. 402) sentence may be imposed pursuant to the provisions of such Act.

18 U.S.C. § 4216 (1982). Under the Youth Corrections Act, a court is given special latitude in sentencing if it finds that incarceration will not benefit the offender, or if some other treatment is more appropriate. 18 U.S.C. § 5010 (1982).

**4.** The Government concedes that Archibald's conviction under Count One charging the lesser offense under 18 U.S.C. § 2113(a) (1982) should be vacated and merged with his conviction under Count Two for armed bank robbery under 18 U.S.C. § 2113(d) (1982). *Grimes v. United States*, 607 F.2d 6, 15 (2d Cir.1979). Why we continue to have to say this and correction is not made in the district court we are at a loss to comprehend. *Grimes* is, after all, almost five years old.