**UNITED STATES of America**

v.

**Coleman BEELER, Defendant.**

**No. CRIM. 98–61–P–C.**

United States District Court,
D. Maine.

*July 1, 1999.*

138

George T. Dilworth, Asst.U.S.Atty., Helen Kazanjian, Asst.U.S.Atty., Office of the U.S. Attorney, Portland, OR, for the Government.

Julian L. Sweet, Steven D. Silin, Jodi L. Nofsinger, Berman & Simmons, P.A., Lewiston, OR, for Defendant Coleman Beeler.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, District Judge.

Defendant, Coleman Beeler, faces charges of malicious damage of a vehicle by means of explosive materials and aiding and abetting in violation of 18 U.S.C. § 844(i) and 18 U.S.C. § 2 (Count One), conspiracy to maliciously damage a vehicle by means of explosive materials in violation of 18 U.S.C. § 371 (Count Two), possession of an unregistered firearm (destructive device) and aiding and abetting in violation of 26 U.S.C. §§ 5841, 5861 and 18 U.S.C. § 2 (Count Three), use of explosive materials to collect extensions of credit by extortionate means and aiding and abetting in violation of 18 U.S.C. § 844(h) and 18 U.S.C. § 2 (Count Four), and use of extortionate means to collect an extension of credit and aiding and abetting in violation of 18 U.S.C. § 894 and 18 U.S.C. § 2 (Count Five). Now before the Court is Defendant's pretrial motion to suppress an in-court identification of Defendant by Michael Swan, DNA evidence, and edited and enhanced versions of a surveillance videotape taken at a Mobil Mini–Mart in Yarmouth, Maine (Docket No. 65) and the Government's objection thereto (Docket No. 69). After conducting an evidentiary hearing on March 31, 1999, and reviewing

counsel's memoranda, the Court concludes that Defendant's motion should be granted in part and denied in part.

## I. BACKGROUND

In the early hours of July 26, 1997, a pipe bomb was detonated in a 1995 black Infinite G20 belonging to Dorothy Nickerson, which was parked on Indian Ridge Road in Yarmouth. Transcript of Proceedings on March 31, 1999 ("Tr.") (Docket No. 63) at 39–40. Yarmouth police officers, including Officers Sean Urquhart and Paul Martin, and ATF Special Agent Joseph Robitaille responded to the scene and began an investigation. Tr. at 39–40, 52–53, 100. At approximately 5:45 p.m. on the same day as the bombing, Officer Urquhart received a telephone call from Michael Swan who was working at the Mobil Mini–Mart in Yarmouth on July 26, 1997, at approximately 2:30 a.m. Tr. at 40. Swan told Officer Urquhart that a man had entered the Mobil Mini–Mart and asked for directions to Indian Ridge Road. Tr. at 40–41. Swan described the man as being six feet to six feet, two inches tall, weighing approximately 150 to 160 pounds, with dark brown to black hair, cut short. Tr. at 42.

Officer Urquhart interviewed Swan at the Mobil Mini–Mart within sixteen hours after the bombing. Swan gave Officer Urquhart the surveillance videotape taken at the Mobil Mini–Mart on July 26, 1997, and, when viewed, was able to point out the individual who had requested directions to Indian Ridge Road even though the date and time stamps on the video were inaccurate. Tr. at 44. On July 26, 1997, from Swan's description, Officer Martin made a composite sketch of the individual that appeared in the newspaper. Tr. at 115–17. A Portland police officer identified Defendant as the person depicted in the sketch. Tr. at 119.

Yarmouth Police Officer Paul Martin pieced together a photo lineup consisting of six photographs on July 29, 1997. Tr. at 100. Picture three depicted Defendant.

Tr. at 103, Government's Exhibit 12. Officer Martin showed Swan the lineup at the Yarmouth police station and asked Swan if any of the individuals depicted in the photo spread was the individual who had asked for directions to Indian Ridge Road on July 26, 1997. Tr. at 104–05. Swan examined the photographs for approximately five minutes and said he could not make a positive identification because he was torn between pictures one and three. Tr. at 105–06.

Swan gave the Yarmouth Police Department the surveillance videotape taken at the Mobil Mini–Mart on July 26, 1997, that depicts the individual who, according to Swan, asked for directions to Indian Ridge Road. This original version of the surveillance video was admitted as Government's Exhibit 1 at the evidentiary hearing. ATF Special Agent Joseph Robitaille obtained the original tape from the Yarmouth Police Department and sent it to Jack Hunter, an audio and visual enhancement specialist working for the ATF in Washington, D.C. Tr. at 2, 6. Mr. Hunter testified at the hearing conducted on March 30, 1999, about the methods he used to edit and enhance the surveillance videotape. At the hearing, the edited version was submitted as Government's Exhibit 2 and the enhanced version as Government's Exhibit 3.

Defendant was arrested on October 30, 1998, and ordered to be detained until trial. Stipulation Regarding Time Line (Government's Exhibit 10) at 1. The Government and Defendant engaged in plea negotiations from approximately November 13, 1998, until December 10, 1998, when Defendant notified the Government that he would not agree to the Government's plea offer. Stipulation Regarding Time Line at 1. On January 25, 1999, the Government obtained a warrant for blood samples from Defendant. Stipulation Regarding Time Line at 2. In the affidavit submitted to support its application for the warrant for Defendant's blood, the Government stated that cigarette butts

were found at the scene, and that codefendant Bryant Feyler had admitted that he lit the bomb with a cigarette that Defendant was smoking. Stipulation Regarding Time Line at 2. On January 27, 1999, blood samples were taken from Defendant and they were delivered to Cellmark Diagnostics ("Cellmark"), a private laboratory, on January 28, 1999. Stipulation Regarding Time Line at 2. On January 29, 1999, two cigarette butts found at the scene of the crime were delivered to Cellmark. Stipulation Regarding Time Line at 2. The Government paid a premium to have the results of the analysis expedited. Stipulation Regarding Time Line at 3. On February 15, 1999, Cellmark issued a report that concluded that Defendant's blood type matched that of the smoker of the cigarette butt labeled "unmarked cigarette filter," but that one in 4,800 Caucasians have that blood type. Stipulation Regarding Time Line at 3. Defendant's counsel was provided with a copy of the Cellmark report on February 17, 1999. Stipulation Regarding Time Line at 3. The Government informed Defendant's counsel that it planned on seeking further testing and provided counsel with the *curriculum vitae* of Jacki Higgins, a staff DNA analyst for Cellmark who performed the first tests, and that of Glen Hall, a second Cellmark DNA analyst, who may testify regarding the findings at trial. Stipulation Regarding Time Line at 3, 4.

This case was scheduled for jury selection on March 30, 1999, and commencement of trial immediately thereafter. On March 22, 1999, Defendant filed his consolidated Trial Brief and Memorandum in Support of Motion *In Limine* (Docket No. 54) which sought to exclude the in-court identification of Defendant by Swan, the DNA test results, and the enhanced videotape. That afternoon Cellmark issued its new report which concluded that Defendant's DNA profile matched that of the smoker of the "unmarked cigarette filter" and that one in sixty-six million Caucasian males have that DNA profile. Stipulation

Regarding Time Line at 4. The Government faxed this report to defense counsel. *Id.* At a pretrial conference, the Court determined that resolution of Defendant's pretrial motions required an evidentiary hearing and briefing and, thus, continued the trial and set the hearing date for March 31, 1999. After the hearing, a schedule was set, with Defendant's reply brief due on May 27, 1999. Jury selection with trial to commence thereafter, has been scheduled for July 12, 1999.

## II. DISCUSSION

### A. *In-Court Identification.*

 Defendant seeks to prevent an in-court identification of him by Swan, the clerk at the Mobil Mini-Mart in Yarmouth. He claims that an in-court identification by Swan will be impermissibly suggestive and, thus, will violate his right to due process. The Due Process Clause protects accused individuals from the use against them of evidence derived from unreliable identification that results from impermissibly suggestive procedures. *See Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). The United States Supreme Court has declared that a due process challenge to an in-court identification requires a two-step analysis: whether a pretrial identification procedure was impermissibly suggestive and, if so, whether the in-court identification is nonetheless reliable under the totality of the circumstances. *See Neil v. Biggers,* 409 U.S. 188, 198-99, 93 S.Ct. 375, 381-82, 34 L.Ed.2d 401 (1972); *United States v. Gray,* 958 F.2d 9, 13-14 (1st Cir.1992); *United States v. Maguire,* 918 F.2d 254, 263 (1st Cir. 1990).

 In evaluating the second prong of reliability, the Court must consider the following factors:

the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of

the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Biggers*, 409 U.S. at 199–200, 93 S.Ct. at 382. Against this assessment, a court should weigh the "corrupting effect" of the suggestive identification procedure to determine whether there was "such a substantial likelihood of irreparable misidentification" that the in-court identification testimony should not be heard by the jury. *See Brathwaite*, 432 U.S. at 116, 97 S.Ct. at 2254 (1977). If so, it must be suppressed.

Two days after he gave directions for Indian Ridge Road to an individual at the Mobil Mini–Mart, Swan participated in a photo lineup that consisted of six photographs, number three of which depicted Defendant. Tr. at 100–01. Officer Paul Martin of the Yarmouth Police Department asked Swan if any of the individuals depicted in the photo spread was the individual who had asked for directions on July 26, 1997. Tr. at 105. Swan examined the photographs for approximately five minutes and said that he could not make a positive identification because he was torn between pictures one and three. Tr. at 105–06. Given that Swan was unable to select Defendant from the lineup, the Court will presume that the pretrial identification procedure was not so impermissibly suggestive as to cause the substantial likelihood of misidentification. Indeed, Defendant concedes that this is so. Despite Swan's inability to select Defendant from the photo lineup, his description of Defendant enabled the officers to complete a composite drawing, from which a Portland police officer identified Defendant. Tr. at 119.

■ Defendant does not challenge the in-court identification on the ground that the pretrial photo identification procedure was impermissibly suggestive in such a manner as to cause a substantial likelihood of misidentification in court. Rather, Defendant argues that an in-court identification by Swan, who has not made a prior positive identification of Defendant, would be impermissibly suggestive in and of itself. The Court agrees.

The United States Supreme Court and the United States Court of Appeals for the First Circuit have not addressed how the constitutionality of an in-court identification under these circumstances should be analyzed. Absent such authority, this Court agrees with the Court of Appeals for the Sixth Circuit which applied the two-step *Biggers* analysis outlined above to determine the constitutionality of an in-court identification and stated:

> We hold that the *Biggers* analysis applies to such in-court identifications for the same reasons that the analysis applies to impermissibly suggestive pretrial identifications. The due process concerns are identical in both cases and any attempt to draw a line based on the time the allegedly suggestive identification technique takes place seems arbitrary. All of the concerns that underlie the *Biggers* analysis, including the degree of suggestiveness, the chance of mistake, and the threat to due process, are no less applicable when the identification takes place for the first time at trial.

*United States v. Hill*, 967 F.2d 226, 232 (6th Cir.1992); *see also United States v. Murdock*, 928 F.2d 293, 297 (8th Cir.1991); *United States v. Archibald*, 734 F.2d 938, 941–42 (2nd Cir.1984), *op. modified*, 756 F.2d 223 (2nd Cir.1984).[1] Accordingly, the

---

1. In deciding that an in-court identification of Defendant by Swan may be impermissibly suggestive in this case, the Court implicitly disagrees with the Government's argument that in-court identifications are *always* admissible unless an impermissibly suggestive pretrial identification has occurred. In all of the

cases delineating the standards of when an in-court identification following an impermissibly suggestive pretrial identification had to be excluded, no guidelines were set for in-court identification procedures, nor is it indicated that in-court identification must be made in a way that is not suggestive. Indeed, the Court

Court will apply the *Biggers* analysis to determine whether an in-court identification of Defendant by Swan will violate Defendant's due process rights.

The propriety of an in-court eyewitness identification is determined by the trial court in the exercise of its discretion. *See United States v. Bennett,* 675 F.2d 596, 598 (4th Cir.1982); *United States v. Williams,* 436 F.2d 1166, 1168–69 (9th Cir.1970), *cert. denied,* 402 U.S. 912, 91 S.Ct. 1392, 28 L.Ed.2d 654 (1971); *United States v. Ravich,* 421 F.2d 1196, 1203 (2nd Cir.), *cert. denied,* 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970). Generally in the First Circuit, except in extraordinary cases, in-court identification testimony is admissible and the in-court identification of a defendant by an eyewitness is a traditional practice. *See Maguire,* 918 F.2d at 264; *United States v. Turner,* 892 F.2d 11, 14 (1st Cir.1989). Despite how traditional the practice of having a witness identify a defendant in the court room may be, a number of courts have commented on the inherently suggestive nature of in-court identifications.

The United States Court of Appeals for the Second Circuit, for instance, has noted that:

> When the witness is asked if he or she can identify the defendant as the perpetrator of the crime, this is surely equivalent to the "show-up" pretrial situation. Only slightly less suggestive is the procedure whereby the witness is asked if he or she can identify the perpetrator of the crime from among those present in the courtroom when the defendant is sitting at the defense counsel table.

of Appeals for the First Circuit has stated that "in-court identification testimony is admissible unless its basis, the pretrial identification, has proven so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." *Maguire,* 918 F.2d at 265. This may suggest that without an impermissibly suggestive pretrial identification, in-court identification testimony is always admissible. However, the Court of Appeals for the First Circuit has not been faced with facts similar

*United States v. Domina,* 784 F.2d 1361, 1368 (9th Cir.1986) (citing cases), *cert. denied,* 479 U.S. 1038, 107 S.Ct. 893, 93 L.Ed.2d 845 (1987); *see also United States v. Rogers,* 126 F.3d 655, 658 (5th Cir.1997) (agreeing with the United States Court of Appeals for the Second Circuit that it is obviously suggestive to ask a witness to identify a perpetrator in the courtroom when it is clear who is the defendant); *United States v. Matthews,* 20 F.3d 538, 547 (2nd Cir.1994) (holding that "the circumstances at trial may themselves be tantamount to a showup, and the trial court has discretion to take steps to avoid any unfairness in the in-court identification"); *Murdock,* 928 F.2d at 297 (noting that in-court procedure where defendant was seated at counsel table and the only African American person in the room was suggestive, although not impermissibly so); *Archibald,* 734 F.2d at 941–42 (holding that the location of defendant at counsel table for the in-court identification was an "obviously suggestive situation"); *United States v. Brown,* 699 F.2d 585, 593–94 (2nd Cir. 1983) (noting the suggestively of an in-court identification); *United States v. Kaylor,* 491 F.2d 1127, 1131–32 (2nd Cir.1973), *J. Vacated on different grounds, U.S. v. Hopkins,* 418 U.S. 909, 94 S.Ct. 3201, 41 L.Ed.2d 1155 (1974) (holding that an in-court identification amounts to a "show-up" but is not *per se* inadmissible or an automatic violation of due process but depends on the totality of the circumstances). The traditional physical setup of a trial, with the defendant seated at the defense table, has been viewed as suggestive in and of itself. *See Hill,* 967 F.2d at 231–33 (assuming for purposes of the motion that the in-court identification of the defendant

to those here where there is a failure to identify the defendant in a pretrial, untainted photo lineup, the prior lineup cannot be the basis for an in-court identification, and the challenge is to the in-court identification. Accordingly, the Court of Appeals for the First Circuit has not ruled that an in-court identification can be inadmissible without an impermissibly suggestive pretrial identification preceding it.

was impermissibly suggestive where the witness had not identified defendant before trial and defendant was seated at counsel table); *Williams,* 436 F.2d at 1168 (noting that "[w]hen asked to point to the robber, an identification witness—particularly if he has some familiarity with courtroom procedure—is quite likely to look immediately at the counsel table, where the defendant is conspicuously seated in relative isolation.").

The Court is concerned that an in-court identification of Defendant under the circumstances of this case is suggestive. Defendant, who at age twenty-one has a youthful appearance which will easily distinguish him from his lawyers seated with him at counsel table, will be easily picked out by Swan as the man accused of the crime. When Swan is asked to identify the man who asked him for directions to Indian Ridge Road, the physical set up of the courtroom will turn this identification into a one-man "show-up." Swan will know that Defendant was arrested and has been charged with the bombing that occurred on July 26, 1997. This fact, combined with his recollection of Defendant's picture in the photographic line up two years ago, will strongly suggest to him that Defendant is, in fact, the man that asked him for directions on the night of the bombing. *See Thigpen v. Cory,* 804 F.2d 893, 896 (6th Cir.1986), *cert. denied Foltz v. Thigpen,* 482 U.S. 918, 107 S.Ct. 3196, 96 L.Ed.2d 683 (1987) (reasoning that "seeing a man in a small line-up for a crime is likely to associate that person with the crime to some degree in the witness's mind."). To permit, two years after the bombing, an in-court identification by a witness who failed to previously identify Defendant in a fair lineup, under circumstances that strongly suggest to Swan that Defendant is the right person, places Defendant at substantial risk of being misidentified. Were Swan to point out Defendant in Court as the person who asked him for directions to Indian Ridge Road on the night of the bombing, that identification would likely be based not on Swan's honest recollection, but on the fact that Defendant is the person charged with the crime. The Court holds that an in-court identification by Swan under the circumstances of this case would be suggestive.

The issue really turns on the more difficult question of whether the in-court identification will create a substantial likelihood of misidentification or is nonetheless reliable. Where an identification procedure is suggestive, reliability is the linchpin for determining admissibility. *See Brathwaite,* 432 U.S. at 114, 97 S.Ct. at 2253. Even an identification under circumstances tantamount to a "show-up" is not *per se* inadmissible but, rather, depends upon the totality of the circumstances. *See Archibald,* 734 F.2d at 942.

The evidence adduced at the hearing indicates that Swan had a good opportunity to observe Defendant at the Mobil Mini–Mart with a high degree of attention. *See Biggers,* 409 U.S. at 199, 93 S.Ct. at 382. The surveillance video showed that Swan spoke to Defendant, while they stood face to face, both inside and outside of the Mobil Mini–Mart. Swan was also able to point out which individual depicted in the videotape it was who asked for directions to Indian Ridge Road from the surveillance tape without the benefit of an accurate date and time stamp on the video because it was not set properly. Tr. at 42–44. In addition, Swan's prior description given to police of the individual who stopped in for directions accurately describes Defendant. *See Biggers,* 409 U.S. at 199–200, 93 S.Ct. at 382. Swan described the individual who asked him for directions on July 26, 1997, as being six feet to six feet, two inches tall, weighing approximately 15–160 pounds, with dark brown to black hair, cut short. Tr. at 42. This description of Defendant was used by Officer Martin in his preparation of the composite sketch, Tr. at 115–16, from which a Portland police officer identified the suspect in the sketch as Defendant. Tr. at 119. These factors counsel that

Swan's identification of Defendant would be reliable.

■ Notwithstanding the fact that Swan had an adequate opportunity to view the individual asking for directions and the accuracy of the composite sketch based on Swan's physical description, the Court is concerned about Swan's failure to identify Defendant from the photo lineup. The strength of an eyewitness's initial identification is a factor to be considered in determining the reliability of an identification. *See Biggers,* 409 U.S. at 199–200, 93 S.Ct. at 382. Whether the suggestive arrangement in the courtroom will create a substantial risk of misidentification may depend on the strength and propriety of the initial identification. Here, this is particularly so because the eyewitness failed to initially identify Defendant in circumstances free of suggestion. Having scrutinized an array that included Defendant's photograph, Swan was unable to identify Defendant. Were the Court to permit Swan to identify Defendant in Court when he is seated at the defense table next to counsel, this would be a case where an earlier failure of identification is overcome by improperly suggestive identification procedures—the very type of situation sought to be replicated by the Supreme Court in *Biggers.* "The reaction 'it has to be him' [would] greatly diminish[ ] the reliability of [Swan's] identification." *United States v. Emanuele,* 51 F.3d 1123, 1131 (3rd Cir.1995). In addition, there exists a lapse of two years between the alleged bombing and the in-court identification, a seriously negative factor in this case. *See*

*Biggers,* 409 U.S. at 199–200, 93 S.Ct. at 382. The failure of Swan to pick Defendant out of a photographic lineup, coupled with the highly suggestive viewing of Defendant in the courtroom under conditions that strongly indicate that he is the criminal, render an in-court identification of Defendant by Swan impermissibly unreliable.[2] *See Emanuele,* 51 F.3d at 1131 (holding that an in-court identification by eyewitness who could not recognize defendant in pretrial photo array, coupled with highly suggestive viewing of the defendant in conditions "reeking of criminality" bolstered by the comments of the other witness was unreliable and should not have been admitted); *Thigpen,* 804 F.2d at 896–98 (holding that in-court identification of defendant in courtroom violated defendant's right to due process where eyewitness had failed to identify defendant in pretrial lineup and had viewed defendant at pretrial court proceeding).

To conclude, the Court finds that Swan's in-court identification would be impermissibly unreliable. Here, where the eyewitness fails to identify a defendant as the perpetrator of a crime in a fair, nonsuggestive, pretrial lineup, that eyewitness will not be given a second chance in court where the surroundings strongly suggest that the person accused of the crime is the actual perpetrator. The Court notes that a number of courts have reasoned that the preferred remedy for a suggestive in-court identification is not, necessarily, the suppression of the identification but an in-court lineup or some other protective mea-

---

**2.** The Government presents a number of cases that are contrary to the conclusion reached by the Court here today. These courts held that an in-court identification of a defendant by a witness who failed to identify the defendant in a pre-trial confrontation is admissible despite the suggestive atmosphere of the courtroom. *See Johnson v. McCaughtry,* 92 F.3d 585, 597 (7th Cir.1996); *Johnson v. Sublett,* 63 F.3d 926, 929 (9th Cir.1995); *United States v. Valenzuela,* 722 F.2d 1431, 1433 (9th Cir.1983); *United States v. Briggs,* 700 F.2d 408, 413 (7th Cir.1983); *United States v. Hamilton,* 684 F.2d 380, 382–83 (6th Cir.1982), *cert. denied,*

459 U.S. 976, 103 S.Ct. 312, 74 L.Ed.2d 291 (1982); *United States v. Bennett,* 675 F.2d 596, 597–98 (4th Cir.1982); *United States v. Saint Prix,* 672 F.2d 1077, 1084 (2nd Cir. 1982); *United States v. Dobson,* 512 F.2d 615, 616 (6th Cir.1975); *United States v. Black,* 412 F.2d 687, 688 (6th Cir.1969), *cert. denied,* 396 U.S. 1018, 90 S.Ct. 583, 24 L.Ed.2d 509 (1970). None of the foregoing cases are from the United States Court of Appeals for the First Circuit, and the Court is not bound by these decisions. The Court has read each case carefully and finds that the reasoning in the foregoing cases is not persuasive.

sure to ensure the fairness of the identification and cross-examination of the eyewitness. *See Brathwaite*, 432 U.S. at 113, 97 S.Ct. at 2252; *United States v. Matthews*, 20 F.3d at 547; *Archibald*, 734 F.2d at 941–42; *Turner*, 892 F.2d at 14. Though an in-court protective measure may be the remedy for suggestive identification procedures in some situations, here, where the eyewitness's identification is unreliable because of his prior failure to identify the defendant in a fair pretrial lineup, the Court holds that the appropriate remedy is to exclude any attempted in-court identification of Defendant by Swan. Having found that an in-court identification of Defendant under the circumstances of this case would violate Defendant's right to due process, the Court concludes that Swan's in-court identification testimony will be excluded at trial.

*B. DNA Evidence.*

The Federal Rules of Criminal Procedure require the Government to provide a criminal defendant with all reports of scientific examinations or tests that are within the possession of the government and are intended for use by the government at trial. *See* Fed.R.Crim.P. 16(a)(1)(D). Defendant contends that the Government violated Federal Rule of Criminal Procedure 16 because it provided him with the results of the DNA testing on March 23, 1999, just one week prior to jury selection and trial. Defendant's argument continues to urge that exclusion of the DNA evidence is the only appropriate remedy because he is prejudiced by the Government's failure to reveal the final results of the DNA testing that incriminates him until just before trial. Federal Rule of Criminal Procedure 16(d)(2) gives the Court broad discretion in imposing sanctions on a party for failure to comply with a discovery order:

> If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances.

Fed.R.Crim.P. 16(d)(2). The Court determines that exclusion of the DNA test results is an inappropriate sanction under the circumstances.

■ In the First Circuit, a district court has broad discretion to address discovery violations in criminal trials in light of their seriousness. *See United States v. Candelaria–Silva*, 162 F.3d 698, 703 (1st Cir.1998) (citing *United States v. Josleyn*, 99 F.3d 1182, 1196 (1st Cir.1996), *cert. denied sub nom., Billmyer v. United States*, 519 U.S. 1116, 117 S.Ct. 959, 136 L.Ed.2d 845 (1997)). It need not grant the "draconian relief" of suppression when it is grossly disproportionate to both the prosecutor's nonfeasance and any prejudice to the defense. *See id.* The Court will borrow the factors outlined by courts in other circuits that a district court should consider in determining what sanction is appropriate for a discovery violation. These courts advise that a district court should consider: (1) the reasons the government delayed producing the requested materials, including whether or not the government acted in bad faith when it failed to comply with the discovery order; (2) the extent of prejudice to the defendant as a result of the government's delay; and (3) the feasibility of curing the prejudice with a continuance. *See United States v. Russell*, 109 F.3d 1503, 1510–11 (10th Cir. 1997); *United States v. Wicker*, 848 F.2d 1059, 1061 (10th Cir.1988); *United States v. Euceda–Hernandez*, 768 F.2d 1307, 1312 (11th Cir.1985); *see also United States v. Tajeddini*, 996 F.2d 1278, 1287 (1st Cir. 1993) (holding that a district court, in exercising its discretion to control discovery rule violations, must inquire into the surrounding circumstances to determine whether the violating party acted in bad faith).

The Court will first examine the Government's explanation for and the surrounding circumstances of the delay. Defendant argues that the Government had sufficient evidence upon which to obtain a warrant for a sample of Defendant's blood at some point in April of 1998, before he was arrested for the crime. Alcohol, Tobacco, and Firearms ("ATF") Special Agent Robitaille testified at the hearing that the Government chose not to obtain a search warrant for Defendant's blood prior to his arrest because it believed that Defendant posed an extreme risk of flight. Tr. at 95–96. In addition, he testified that there was a six-month period of time prior to his arrest in which the Government was not aware of Defendant's location. Tr. at 94–95. Defendant persists, pointing out that when he was arrested on October 29, 1998, more than a year after the alleged bombing, the Government still did not pursue a warrant to obtain his blood even though he remained in custody. The Government counters that from the period of November 13, 1998, until December 10, 1998, Defendant and the Government were engaged in plea negotiations and that it did not want to disturb such negotiations with the service of a warrant nor burden itself with the expenditures for DNA tests if they proved unnecessary. Stipulation Regarding Time Line at 2; Government's Opposition to Defendant Beeler's Motion to Suppress at 14.

Agent Robitaille testified at the hearing that he was first directed to investigate DNA testing on approximately January 5, 1999. Tr. at 57–60, 73, 75. However, the Government did not obtain a warrant for the blood samples until January 25, 1999. Tr. at 75. The Government explains that it took twenty-four days to locate a laboratory to conduct the test, contact the ATF's counsel's office for a sample warrant and application, obtain a blood test kit, and hire a nurse to draw Defendant's blood. Tr. at 57–60. The Government argues that the time period between January 5 and January 29, 1999, during which Agent Robitaille organized the blood drawing, is not unreasonable considering the fact that DNA evidence has never before been used in the district.

Within twenty-four hours of its drawing, the blood was sent to Cellmark. Tr. at 75. On February 2, 1999, the Government requested that Cellmark expedite the tests, and agreed to pay the $1,400 premium for the rush service. Stipulation Regarding Testimony of Jacki J. Higgins ¶ 10. The Government received the test results on February 15, 1999, and notified defense counsel of the report on February 17, 1999. Stipulation Regarding Time Line at 3; Stipulation Regarding Testimony of Jacki J. Higgins ¶ 11. The first test results indicated that the frequency in the Caucasian population of the DNA type obtained by Defendant and the cigarette butt is one in 4,800. Stipulation Regarding Time Line at 3. Between February 18 and 23, 1999, the Government informed Defendant that it would conduct additional DNA testing, known as STR analysis, to further narrow the results. Stipulation Regarding Time Line at 3. On February 23, 1999, the Government authorized Cellmark to conduct the STR test on a rush basis. Stipulation Regarding Testimony of Jacki J. Higgins ¶ 14. Twenty business days later, on March 22, 1999, the Government received the STR test results. Stipulated Time Line at 4. The STR test concluded that the approximate frequency in the Caucasian population of the DNA types obtained from the unmarked cigarette filter and Defendant's blood sample are one in sixty-six million. These were faxed to Defendant on the same day they were received by the Government. Stipulation Regarding Time Line at 4.

■ The Court is satisfied with the Government's explanation for why the DNA test results were provided to Defendant on March 22, 1999. There is no basis in this record to find that it was unreasonable for the Government to delay pursuing a warrant for his blood until Defendant was in custody because of risk of flight. Further-

more, the facts do not indicate that it was unreasonable for the Government to decide not to conduct DNA testing during plea negotiations. The record also demonstrates that the Government consistently told Defendant about its plans to conduct DNA testing and paid premiums so that the results would be expedited. Moreover, Defendant has not pointed to any evidence from which the Court can infer bad faith on the part of the Government. The Court would not condone the nondisclosure of readily available, relevant material nor would it condone a Government trial strategy that involves purposeful delay in providing a criminal defendant with Rule 16 evidence that it plans to use at trial. Here, however, where the Government advised Defendant of its plans regarding DNA evidence at every step of the way, the Court concludes that there is no evidence that the Government purposefully attempted to thwart Defendant's ability to respond and to adjust its trial strategy to the incriminating DNA evidence.

The Court must next examine the extent of prejudice caused to Defendant as a result of the Government's delay and the feasibility of curing the prejudice with a continuance. Given the incriminating nature of the final results of the DNA testing, the Court agrees that had Defendant been unfairly surprised by this evidence, he would have been prejudiced. However, in this case, although Defendant was not told of the favorable results of the DNA testing until just before trial, the Government was forthcoming about the fact that it was conducting DNA tests in January and informed Defendant of the first set of results in February. Thus, Defendant was aware in January, two months before trial and three months after he was arrested, that the Government was attempting to match his DNA to the DNA found on cigarette butts at the crime scene. This is not a case of unfair surprise. Defendant chose not to pursue his own DNA testing at that time. Accordingly, the Court concludes that Defendant did not suffer prejudice as a result of the Government's delay

in providing him with the final results of the DNA tests because he was aware that the testing was being conducted back in January.

■ Finally, the Court concludes that a continuance is the preferred remedy for the delay in discovery in this case. The United States Court of Appeals for the First Circuit has stated its preference for a continuance under these circumstances:

> When discovery material makes a belated appearance, a criminal defendant must ordinarily seek a continuance if he intends to claim prejudice.... As a general rule, a defendant who does not request a continuance will not be heard to complain on appeal that he suffered prejudice as a result of late-arriving discovery. Thus, in a situation where defense counsel does not seek a continuance upon belated receipt of discoverable information, a court often can assume that counsel did not need more time to incorporate the information into the defendant's game plan.

*Candelaria–Silva,* 162 F.3d at 703 (quoting *United States v. Sepulveda,* 15 F.3d 1161, 1178 (1st Cir.1993) (internal quotation omitted)); *see also United States v. Maples,* 60 F.3d 244, 246 (6th Cir.1995) ("We hold that it was an abuse of discretion to impose the most severe sanction, suppression, instead of granting a continuance, if necessary, or ordering less stringent sanctions under Federal Rule of Criminal Procedure 16(d)(2)."). In this case a continuance would have provided Defendant with the opportunity to obtain his own expert to conduct DNA testing or to otherwise adjust his trial strategy to the introduction of the evidence. In effect, the Court gave Defendant an opportunity to respond to the DNA evidence by virtue of its order on March 23, 1999, scheduling a hearing and opportunity for all of the issues raised by Defendant's pre-trial motions to be briefed. Impanelment of a jury, with trial to commence immediately thereafter, has now been scheduled for July 12, 1999. De-

fendant has now had the opportunity to prepare to respond to the DNA evidence presented to him on March 22, 1999. Accordingly, the Court will deny Defendant's motion to suppress the DNA evidence.

### C. Mobil Mini–Mart Surveillance Tape.

Although he does not object to the admission of the original surveillance videotape from the Mobil Mini–Mart (Government's Exhibit 1), Defendant seeks to have the edited and enhanced copies of the surveillance videotape (Government's Exhibits 2 and 3)[3] excluded at trial. Defendant seeks to suppress the copies on two grounds: (1) that a copy is inadmissible pursuant to the best evidence rule and (2) that the copies are untrustworthy because they are susceptible to tampering and subtle modification through enhancement. The Court disagrees with Defendant and holds that the edited and enhanced versions of the Mobil Mini–Mart surveillance video are admissible at trial.

■ The same contours of law that govern the admissibility of a taped audio recording and photographs are to be applied to the question of whether surveillance videotape is admissible. *See United States v. Bernal,* 884 F.2d 1518, 1523 (1st Cir.1989); *United States v. Arriaga Torres,* 1993 WL 525651 *2 (D.P.R.1993). To prove the content of a recording or photograph, the original is required except as otherwise provided in the Federal Rules of Evidence. *See* Fed.R.Evid. 1002. However, a duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) under the circumstances it would be unfair to admit the duplicate in lieu of the original. *See* Fed.R.Evid. 1003. Under Federal Rule of Evidence 1001(4), a

"mechanical or electronic rerecording ... which accurately reproduces the original" is a "duplicate." *See* Fed.R.Evid. 1001(4). Rerecordings of videotapes by a mechanical or electronic objective device that accurately reproduces the original images on the tape are "duplicates." Furthermore, rerecordings that are enhanced so that the images are clearer to depict are also "duplicates" so long as the tapes accurately reproduce the original images on the tape. *See Fountain v. United States,* 384 F.2d 624, 631 (5th Cir.1967) (applying best evidence rule to enhanced audio recording). Here, at the evidentiary hearing, the Court had the opportunity to view the three copies of the Mini–Mart surveillance videotape and finds that all three tapes depict the same images. Thus, the videos are mechanical rerecordings and are "duplicates" admissible subject to the restrictions set forth in Federal Rule of Evidence 1003. Neither of the two exceptions set forth in Federal Rule of Evidence 1003 apply in this case: Defendant does not challenge the authenticity of the original videotape or argue that it is unfair that the duplicate be admitted. Thus, the edited and enhanced versions of the videotape are not inadmissible pursuant to the best evidence rule.

■ Defendant argues that the duplicates should be excluded because they are inauthentic and untrustworthy as they were enhanced by the Government. The decision of untrustworthiness, and, thus, the admissibility of the second and third versions of the Mobil Mini–Mart surveillance videotape, is committed to the sound discretion of the Court. For the videotape to be admissible, the Government has the duty of laying a foundation that the videotape rerecordings accurately reproduce the

---

**3.** The Government contends that Defendant does not object to the admission at trial of Government's Exhibit Two. The Court tends to agree with the Governments' characterization of Defendant's argument but finds that Defendant's Memorandum In Support of "Motion to Suppress" on this point is unclear. At the bottom of page 11, Defendant writes

that Government's Exhibit Three is inadmissible for two reasons. However, Defendant concludes this section on page 12 with the statement that Exhibit Two should therefore be excluded at trial. The Court will, thus, consider the motion to suppress as it applies to both versions of the videotape.

scenes that took place, *i.e.*, that they are accurate, authentic, and trustworthy. Once this is done, the party challenging the rerecordings bears the burden of showing that they are inaccurate. *See United States v. Carbone*, 798 F.2d 21, 24 (1st Cir.1986) (holding that as long as the tape recording is properly authenticated, it saw no reason why a rerecording that has been enhanced to improve its audibility by filtering out background noises and improving the clarity of voices should not be allowed in evidence).

■ The Court is satisfied, having viewed the later versions of the tape, that the edited and enhanced versions of the Mobil Mini–Mart surveillance videotape are accurate, authentic, and trustworthy representations of the original tape. At the hearing, the Court received testimony from Mr. Hunter, who has been an ATF visual enhancement expert for eight-and-a-half years. Tr. at 2. He explained that the original Mobil Mini–Mart surveillance tape from July 26, 1997, was made on a time lapse recorder and is best viewed on a time lapse player. Tr. at 3, 8–10. The videotape was made by three cameras that switch to different scenes, one of which videotapes the check-out counter and the door where the suspect could be viewed. Tr. 9–11, 17. The second camera was off line during the relevant time period and videotaped blank screens, and a third camera videotapes a kiosk displaying sunglasses. Tr. at 10, 17. In regard to the edited version (Government's Exhibit Two), Mr. Hunter testified that he edited the original tape to include only the portions of the videotape that depict the suspect asking for directions on July 26, 1997, thus, eliminating the scenes recorded by the second and third cameras in the store and eliminating the fuzzy portions in between the frames. Tr. at 17–18.

Mr. Hunter explained that to produce the enhanced version (Government's Exhibit Three), he copied certain specific frames from the original tape to a computer and, using a computer program called Image Lab, enhanced the quality of those images by adjusting the contrast and brightness of those images and enlarging portions of the still frames that depict the suspect. Tr. at 20, 33–37. Mr. Hunter testified that he did not modify the actual images, but only added shading so that the images could be seen better. Tr. at 19–22. Mr. Hunter recorded the changes to the images as they were being made. Tr. at 37. Furthermore, he testified that the images in the second and third versions of the videotape were not altered. The Court viewed all three versions of the Mobil Mini–Mart videotape at the hearing and is satisfied that they depict the same images and have not been manipulated to impermissibly alter the images.

■ Besides arguing that the process of videotape enhancement is uniquely susceptible to tampering and subtle modification through enhancement techniques that he is not familiar with, Defendant sets forth no facts that tend to show that the edited or enhanced versions of the videotape are inauthentic or untrustworthy. After hearing the testimony of Mr. Hunter regarding the techniques of video enhancement, the Court is satisfied that the enhanced version of the videotape is an accurate representation of the images portrayed in the original surveillance videotape. The enhanced version is different only in that extraneous frames are no longer present and the images are larger, clearer, and easier to view. The law in the First Circuit is clear that an audiotape recording is not rendered inadmissible in a criminal case simply because it has been technically enhanced so as to eliminate background noise and to make the tape easier to understand by the jury. *United States v. Panzardi–Lespier*, 918 F.2d 313, 314, 318 (1st Cir.1990); *United States v. Chaudhry*, 850 F.2d 851, 855 (1st Cir. 1988); *Carbone*, 798 F.2d at 24; *United States v. Santos*, 1993 WL 278557 *1 (D.P.R.); *Arriaga Torres*, 1993 WL 525651 at *2; *United States v. Gambale*, 610 F.Supp. 1515, 1526 (D.Mass.1985),

*aff'd United States v. Angiulo,* 847 F.2d 956, 977–78 (1st Cir.1988). The Court fails to see how the enhancement process applied in this case to a videotape differs in any significant way from that applied to audio recordings.

The edited and enhanced versions of the Mobil Mini–Mart surveillance videotape are admissible because they have been proven accurate and serve to present the substance of the original videotape in a more easily understood form which is in accord with the spirit of the best evidence rule. This decision is in accord with that of courts considering the admissibility of enhanced audio recordings in criminal proceedings. *See Panzardi–Lespier,* 918 F.2d at 318 (affirming admission of enhanced audiotape recording into evidence after court heard testimony from the expert who had enhanced and filtered the recordings to eliminate background noise); *Chaudhry,* 850 F.2d at 854 (affirming decision to allow enhanced audiotape recordings into evidence where a DEA technician testified that the recordings were enhanced was not error); *Angiulo,* 847 F.2d at 977–78 (affirming decision that the government made a good cause showing to unseal original tapes where government sought to unseal the original tapes and transport them to Washington, D.C. to be enhanced for use at trial); *United States v. Gordon,* 688 F.2d 42, 43–44 (8th Cir.1982) (affirming decision to admit filtered versions of audiotapes after the person who filtered the tapes testified as to the process and his care and control of the original tapes); *Fountain v. United States,* 384 F.2d 624, 631 (5th Cir.1967) (affirming decision to admit enhanced audio recordings so as to reduce background noise after the court found that the copy was an accurate reflection of the conversations transcribed); *United States v. Madda,* 345 F.2d 400, 403 (7th Cir.1965) (affirming decision to admit tape recording enhanced to remove background noise after court heard testimony from expert that enhanced tape truly and accurately reflected the substance of the original). Having decided that the edited

version and the enhanced versions accurately reflect the original Mobil Mini–Mart videotape, the Court denies Defendant's motion to exclude this evidence.

### D. Speedy Trial Considerations.

The Speedy Trial Act requires that the trial of a defendant charged in an indictment shall commence within seventy days from the filing date of the indictment. *See 18 U.S.C. § 3161(c)(1); see also Henderson v. United States,* 476 U.S. 321, 322, 106 S.Ct. 1871, 1872–73, 90 L.Ed.2d 299 (1986). This case was originally scheduled for jury selection with trial to commence immediately thereafter on March 30, 1999. On March 22, 1999, Defendant filed his trial brief which included motions *in limine* to suppress the in-court identification, the DNA evidence, and the edited and enhanced versions of the Mobil Mini–Mart surveillance videotape. At a conference with counsel on March 23, 1999, the Court determined that an evidentiary hearing and briefing were necessary for the Court to competently resolve the issues raised by Defendant's pretrial motions. The Government advised the Court that it would like an opportunity to research and brief the issue of the in-court identification and to present evidence on the enhancement process of the surveillance videotape. Instead of impaneling a jury and requiring it to stand by while the Court conducted a hearing on these issues, the Court continued trial and scheduled an evidentiary hearing on the motions for March 31, 1999, with briefing to follow. The Court ruled that all time consumed in consideration of the motions was excludable time in the calculation under the Speedy Trial Act.

Title 18 U.S.C. § 3161(h) provides that the delay resulting from the filing of any pretrial motion through the conclusion of the hearing, or other prompt disposition, of such motion shall be excluded from the computation of time remaining under the Speedy Trial Act. Motions *in limine*

are pretrial motions, the delay caused by their deliberation being excludable under the Act. *See United States v. Sposito,* 106 F.3d 1042, 1044 (1st Cir.1997) (holding that motions *in limine* are "pretrial motions" for the purposes of section 3161(h)(1)(F) of the Speedy Trial Act, implying that the filing of such a motion tolls the Speedy Trial Act clock); *United States v. Rojo–Alvarez,* 944 F.2d 959, 966 (1st Cir.1991) (holding that time from date motion *in limine* was filed to date district court decided to reserve ruling until trial was excludable).

 The Court determined that an evidentiary hearing and briefing was necessary to resolve the issues raised by Defendant's pretrial motions. There was no delay between the filing of the motions and the scheduling of the hearing. *See Rojo–Alvarez,* 944 F.2d at 966 ("We do not believe that a court should put off consideration of a motion and exclude the time during which the motions lies dormant. However, when the court is presented with papers styled as a motion, whether it ultimately determines that the filing is a pretrial motion ... the Court is entitled to exclude at least the period of time during which it considers how to treat the filing."). The Court ordered an evidentiary hearing to promptly commence on March 31, 1999, with briefing to follow so that it could resolve the issues raised by Defendant's pretrial motions. The Supreme Court has stated that "[t]he provisions of the [Speedy Trial Act] are designed to exclude all time that is consumed in placing the trial court in a position to dispose of a motion." *Henderson,* 476 U.S. at 331, 106 S.Ct. at 1877; *see also* 18 U.S.C. § 3161(h)(1)(F). Thus, the period of time between the actual filing of pretrial motions and the hearing on the motions is excludable, as is the time during with the Court had the motions under advisement. *See United States v. Barnes,* 159 F.3d 4, 10–11 (1st Cir.1998) (holding that magistrate judge properly excluded period between the actual filing of the pretrial mo-

tions and the hearing on the motions and correctly excluded the days during which she had the initial batch of pretrial motions under advisement). Here, the pretrial motions were filed on March 22, 1999, a hearing was conducted on March 31, 1999, and the motions were fully briefed when Defendant filed a reply brief on May 27, 1999. The Court issued its decision on these motions approximately a month after they were fully briefed. The Court finds that the period of time when the motions were under consideration was reasonably prompt considering the substance of Defendant's pretrial motions. This period is, thus, excludable under the Speedy trial Act.

Defendant contends that the Court must exclude the delay in trial caused by the continuance because the continuance was precipitated by the Government's delay in turning over the DNA evidence. To state its claim, Defendant relies on the section of the Speedy Trial Act that provides,

No continuance under subparagraph (A) [in the interests of justice] shall be granted because of general congestion of the court's calendar, or lack of diligent preparation or failure to obtain available witnesses on the part of the attorney for the Government.

18 U.S.C. § 3161(h)(8)(C). It is true that the Speedy Trial Act requires that a criminal defendant's right to a speedy trial not be compromised by the problems of bureaucracy. However, in this case, the Court determined that a continuance was necessary because of the issues raised by *all three* of the motions including the exclusion of an in-court identification and the use of the edited and enhanced versions of the Mobil Mini–Mart videotape. The Court ordered the evidentiary hearing so that it could hear from the Governments' expert on the enhancement process and ordered the briefing to hear argument related to the in-court identification.

Defendant cites *United States v. Dog Taking Gun,* 7 F.Supp.2d 1118, 1121–22 (D.Mont.1998), where the court deter-

mined that the delay in trial caused by the continuance granted as a result of the Government's discovery violation was not excludable time, as support for his position that the delay in trial caused by the Court's consideration .of his pretrial motions is excludable. This is simply not a case where Defendant was forced to waive his right to speedy trial because a continuance was granted by the Court as a remedy for a discovery violation. The delay in trial in this case was necessary so that the Court could resolve the issues raised by Defendant's pretrial motions. The Court concludes, therefore, that the time during which Defendant's pretrial motions were under consideration is excludable under the provisions of the Speedy Trial Act.

## III. CONCLUSION

Accordingly, the Court **ORDERS** that Defendant's Motion to Suppress be, and it is hereby **GRANTED** as to the in-court identification and **DENIED** as to the DNA evidence and the enhanced version of the surveillance videotape.