IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 26, 2013 Session

## STATE OF TENNESSEE v. WILLIAM FRANKLIN ROBINETTE

**Direct Appeal from the Criminal Court for Greene County**
**No. 10-CR-211     John F. Dugger, Jr., Judge**

**No. E2012-00640-CCA-R3-CD - Filed September 30, 2013**

A Greene County Criminal Court Jury convicted the appellant, William Franklin Robinette, of two counts of soliciting first degree premeditated murder.  For each conviction, the trial court sentenced the appellant to twenty years in the Tennessee Department of Correction, with the sentences to be served consecutively to each other and to a previously imposed sentence for a total effective sentence of fifty years.  On appeal, the appellant challenges the sufficiency of the evidence supporting his convictions, the admission of a recording and transcript of the solicitation, the trial court's failure to dismiss count two because of a violation of the Confrontation Clause, and the sentence imposed by the trial court.  Upon review, we affirm the appellant's convictions.  However, the record reflects that no presentence report was prepared prior to the appellant's sentencing hearing.  Therefore, the case must be remanded for a new sentencing hearing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are**
**Affirmed in Part, Reversed in Part; Case Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Lindsey Lane, Greeneville, Tennessee, for the appellant, William Franklin Robinette.

Robert E. Cooper, Jr., Attorney General and Reporter; Kyle Hixson, Assistant Attorney General; C. Berkeley Bell, District Attorney General; and Cecil Mills, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

The appellant's convictions stem from his solicitation of Allen Correll and Amanda Turner to kill Rick Bowser, the appellant's co-defendant in another case, and Bowser's girlfriend, Ina Roberts. At trial, Greene County Sheriff's Detective Mike Fincher testified that on or around May 15, 2010, he was contacted by an agent from the Tennessee Bureau of Investigation (TBI) about the solicitation of murder. Afterward, Detective Fincher and Investigator James Randolph met with Correll and Turner. During the meeting, Correll revealed the details of a conversation with the appellant at the Greene County Courthouse. Correll, who had the appellant's telephone number, made a controlled call to the appellant and arranged to meet him on May 25, 2010, at a Wendy's Restaurant.

Before the meeting, Detective Fincher equipped Correll with a listening device. Correll and Turner then drove to the Wendy's. Detectives Fincher and Ricker and Investigator Randolph drove separately and parked at an RV center where they could see the Wendy's parking lot and listen to the audio transmission. After a short time, Detective Fincher heard a telephone ring and Correll speak for a few minutes. When the call ended, Correll told Detective Fincher that the appellant wanted to move the meeting to a nearby Stuckey's restaurant. At the new location, the police parked nearby.

Detective Fincher said that he listened to the conversation as it took place and that he recognized the voices of the appellant, Correll, and Turner. During the conversation, the appellant asked Correll "about blowing up a trailer. In order to do that he needed propane tanks and water hose." Correll asked why he could not shoot the victims. The appellant explained that the victims had dogs and that after the first victim was shot, the other victim would call the police. The appellant insisted that Correll use propane tanks to blow up the house. After a brief conversation, they arranged to meet at 5:00 or 5:30 p.m. the next day at the appellant's residence. The appellant instructed Correll to bring the propane tanks and hose with him to the meeting. Detective Fincher said the men discussed payment, but he could not recall the specific amount.

After the May 25 meeting, Detective Fincher discovered that the conversation had not been recorded. Therefore, the officers made notes regarding their recollection of the conversation. Correll and Turner agreed to go to the Greene County Sheriff's Department the next day.

Detective Fincher said that before the May 26th meeting, he gave Correll and Turner an air compressor hose and two propane tanks, which were the size that would fit a gas grill. Detective Fincher placed a camera in Turner's purse and equipped Correll with the listening device that had been used the previous day. Correll and Turner went to a residence where they believed the appellant lived, and someone there informed them that the appellant was at a residence on Baileyton Highway. Thereafter, the police followed Correll and Turner to

that location and found the appellant there.

Detective Fincher said that when Correll and Turner arrived at the residence around 5:00 or 6:00 p.m., the appellant was assisting with a yard sale. Via the listening device, Detective Fincher heard a conversation between the appellant, Correll, Turner, and Aaron Moore, who was shopping at the yard sale. Due to the traffic on the highway, the conversation was occasionally difficult to hear. Nevertheless, Detective Fincher heard the appellant say that he wanted Correll and Turner to blow up the mobile home of Roberts and Bowser, who was the appellant's co-defendant on a theft charge. The appellant told Correll

> that if you would put those propane tanks under the house trailer and turn them on ever so slightly you would have to run hose from where the propane tanks were, . . . about two hundred feet, away from the house. Then you would use another propane tank to charge that water hose line, and then once that line was charged it would act as a fuse. It would light one end of the hose that you were actively safe and the propane would burn up the hose and eventually reach to where the propane tanks were.

The appellant said that he would furnish two propane tanks. The appellant said that the victims had dogs and suggested that Correll and Turner feed them to keep them quiet while positioning the propane tanks. Moore stated that his father worked for a local propane company and that he could procure large propane tanks for a price. The appellant told Correll and Turner to steal the water hose so that it could not be traced to them. The appellant gave them $20 cash.

After the conversation, Correll and Turner left the residence, and Correll gave the $20 to Detective Fincher. Officers from the Greene County Sheriff's Department and the Greeneville Police Department's Special Response Team arrested the appellant and searched the appellant's residence.

Detective Fincher said that the conversation was successfully recorded, that he had listened to the recording, and that it was an accurate reflection of the conversation he heard.

On cross-examination, Detective Fincher said that his initial "tip" came on May 15 from TBI Agent Scotty Ferguson. Agent Ferguson advised Detective Fincher that the TBI had received a call regarding the appellant's attempt to solicit Correll and Turner to kill the victims. Detective Fincher said that at the time of his initial meeting with Correll and Turner, there were no outstanding warrants against them. Detective Fincher acknowledged that he never saw the appellant at Stuckey's. Detective Fincher thought that Correll was speaking

with the appellant on the telephone, but he could not affirmatively say it was the appellant to whom Correll was speaking. He conceded that he did not obtain any telephone records for confirmation.

Detective Fincher said that he did not know Correll "personally" but that he knew him "professionally." He explained that Correll and Turner had prior legal problems and that both were addicted to drugs. Detective Fincher stated that he had training to identify when a person was under the influence of an intoxicating substance. He was not certain whether Correll was under the influence on May 26, but he "wouldn't doubt it." Detective Fincher said "[t]here's no doubt that [Turner] was probably under . . . some kind of medication," but her speech was not slurred.

Detective Fincher stated that at the time of the initial meeting with Correll and Turner, they were both on probation for misdemeanor offenses. Correll and Turner offered the police information about the appellant to try to get off probation. Detective Fincher told them that he did not have that authority, but he offered to talk to the trial court about their cases. Detective Fincher said that police used Correll and Turner as confidential informants because "[t]hey were the ones that were approached by [the appellant]. He didn't unfortunately, . . . go to the Ruritan Club to find someone to do this crime." They later were arrested for violating their probation.

Detective Fincher said that "[t]he video surveillance [was] not the best in the world" and that Turner was carrying the camera in her purse and she moved around. He estimated that approximately ten people were at the yard sale. Detective Fincher could not conclusively recall how much money the appellant offered Correll and Turner, but he thought the appellant mentioned paying $5,000. Detective Fincher spoke with Moore, who said that "once he understood what was going on in the conversation that he got scared. He didn't know what to do. He didn't want to wimp out." Detective Fincher said that Moore had nothing to gain by the victims' deaths.

Defense counsel asked Detective Fincher whether he heard anything "on that recorded conversation from May 25 where the [appellant] sa[id] he intentionally want[ed] Mr. Correll to kill Ina Roberts or Ricky Bowser." In response, Detective Fincher said:

> [The appellant] says that he wants the propane tanks put under the trailer. He says it will take four to make sure the whole thing goes up. He says that the dogs will have to be dealt with because they'll give away what's going on. So, in my opinion, yes, I mean he's arranging to have . . . Ms. Roberts and Mr. Bowser killed by blowing up their house.

-4-

Greene County Sheriff's Department Lieutenant Jeff Morgan testified that he played a minor role in the investigation. He was present when the appellant was arrested, and he transcribed the audio/video recording for the prosecution. He maintained that the transcription was an accurate reflection of what he heard on the tape.

On cross-examination, Lieutenant Morgan testified that numerous parts of the tape were inaudible and that there was considerable background noise, such as traffic and other voices.

Allen Correll testified that in May 2010, he was standing outside the front of the courthouse, smoking a cigarette, when the appellant approached him about "making [the appellant's] charge partner disappear." The appellant "said if he didn't find somebody to do it that he was going to do [it] himself." Correll said that his wife, Turner, walked in during the last part of the conversation. After Correll and Turner left, they contacted the police. Correll explained that he knew the appellant "[t]hrough a mutual friend."

Correll said that he and Turner first met with Detectives Fincher and Randolph at the Homestead Restaurant. Correll told the detectives about the appellant "approaching me with wanting me to kill his charge partner." The detectives asked Correll to try to get the appellant on tape discussing the plan. Correll went to the parking lot of the restaurant and used a cellular telephone to call the appellant at the telephone number the appellant had given him at the courthouse. The appellant said that he did not want to talk over the telephone and wanted to meet. After the conversation, Correll and Turner went to the police department. Detective Fincher equipped Correll with a listening device.

Correll stated that he was supposed to meet the appellant at Mohawk Crossroads; however, when he and Turner arrived, the appellant told him to go to the Stuckey's at Exit 30. Correll said that during the meeting at Stuckey's, the appellant

> explained to me how that he wanted it done and what I needed to do, what I needed to get to do it with, and told me he'd give me five thousand dollars to pretty much place these propane tanks under his charge partner's house there at his trailer to blow his trailer up with him and I assume it was his wife or whoever was with him at the time.

Correll asked to use a gun, but the appellant said that Correll would not be able to get past the victims' dogs or into the house. Correll said that he was supposed to kill two people with propane tanks and hoses. The appellant told Correll to obtain two propane tanks. The detectives provided the tanks and placed them in the hatchback of Correll's vehicle.

-5-

Correll said that he thought he and Turner would be released from probation in exchange for assisting the police. He said, "I didn't get took off probation but I could've saved a man's life, the way I see it." He maintained that he had not been promised anything in exchange for his testimony.

Correll said that on May 26, he was again equipped with a listening device, and a camera was placed in Turner's purse. Correll and Turner arranged to meet the appellant at his residence. Initially, they went to a residence in Mohawk. Someone there informed Correll that the appellant was not at home. Correll called the appellant, who told him to come to the mobile home on Baileyton Highway.

When Correll and Turner arrived at the mobile home, a yard sale was taking place. The appellant was in the yard, working on a vehicle. Correll and Turner walked up to the appellant and began talking with him. Another man joined the conversation. Correll took the appellant to his car to show him the two propane tanks. The appellant then told Correll how to hook a water hose to the propane tanks, light the hose, and blow up the mobile home. Correll said that the victims' dogs were supposed to be kept inside at night. The appellant offered to pay Correll $5,000.

Correll said that he thought the appellant said the victims' names were "Rick Boward and Ima." The appellant told Correll that Bowser had "snitched on [the appellant] and that way [Bowser] couldn't testify" against the appellant on a charge of felony theft. Correll said that he had watched and listened to the recording of the May 26 conversation, that he had read the transcript, and that the recording and transcript were accurate reflections of the conversation. The State played the recording and provided the transcript to the jury.

Correll said that the appellant gave him $20 "[f]or gas to go riding around and steal water hose." Correll gave the money to Detective Fincher.

On cross-examination, Correll said that on May 10th or May 15th, the appellant was sitting on a bench outside the courthouse before he approached Correll. Correll was at court that day with Turner, who had been caught shoplifting food. The conversation at the courthouse lasted approximately fifteen minutes. Turner came out of the courthouse near the end of the conversation. Correll denied talking to Buddy Randolph and said that Randolph never offered to help Correll in exchange for Correll helping him with a case against the appellant. Correll acknowledged that he was subpoenaed to testify, but he maintained that he was testifying of his own volition. Correll said that Detective Fincher told him that Detective Fincher could not get him off of probation. Correll said that he was under the influence of drugs on May 25 and 26; however, he was not on drugs at the time of trial. Correll denied telling the detectives that he and the appellant discussed going into a field to

test the explosive devices.

Ricky L. Bowser testified that on May 26, 2010, he lived with his girlfriend, Ina Roberts, at 90 Jackson Lane in West Greeneville. At their home, they kept three dogs and some chickens. The dogs would have bitten a stranger. Bowser said that he and the appellant had been charged with the theft of lumber and a Bobcat and that the charges were unresolved at the time of trial. Bowser said that he was not promised anything for his testimony. He maintained that on May 26, 2010, he did not know anyone was trying to kill him.

Greene County Sheriff's Investigator James Randolph testified that in April 2010, he arrested the appellant, Bowser, Robby Carroll, and Robert LaPez on felony theft charges. When Investigator Randolph interviewed the appellant, he told the appellant that his co-defendants and Roberts would testify against him.

Investigator Randolph said that in May 2010, Correll and Turner came to the sheriff's department, and Detective Fincher equipped them with a listening device. The officers followed Correll and Turner to Wendy's where they contacted the appellant. The appellant instructed them to go to Stuckey's. Investigator Randolph heard the conversation and recognized the voices. Acting on Investigator Randolph's instructions, Correll asked the appellant to bring him a rifle to use. The appellant said that Correll could not use a rifle because "the dogs would eat [him] up before [he] got to the house." When Correll suggested that he shoot the dogs, the appellant responded that the victims would then shoot Correll. The appellant said that he would provide two propane tanks and that Correll needed to get two propane tanks and "a couple hundred feet of hose." The appellant wanted to put all four propane tanks under the mobile home. Correll asked if the appellant wanted to kill just Bowser. The appellant replied, "[N]o, I want both of them. . . . [T]hey snitched me out." The appellant said that he would give Correll $5,000.

After the meeting, Investigator Roberts realized that he had inadvertently failed to press the correct button to initiate the recording; therefore, the conversation with the appellant had not been recorded. Investigator Roberts said that he participated in the arrest of the appellant but that he had no further involvement in the case.

On cross-examination, Investigator Roberts said that he did not see the appellant during the meeting. Nevertheless, he recognized the appellant's voice. Investigator Roberts said that he did not see Correll at the courthouse. He did not promise anything to Correll or Turner for their participation in the investigation.

Investigator Roberts stated that the theft case against the appellant was "good" and

that Bowser had not said anything about not testifying against the appellant.

Detective Captain John Huffine with the Greene County Sheriff's Department[1] testified that on May 26, 2010, he accompanied the officers, albeit in a separate vehicle, during the surveillance of Correll and Turner's meeting with the appellant at Stuckey's. Captain Huffine was unable to hear the conversation from his vehicle. After the meeting ended, he went to rendezvous with the officers at their vehicle. As he drove over a slight grade, he met another vehicle coming from the direction of the meeting with Correll and Turner. Captain Huffine clearly saw the driver and recognized him as the appellant.

On cross-examination, Captain Huffine said that he could not recall the vehicle the appellant was driving but that it might have been a sport utility vehicle (SUV).

The State rested its case-in-chief, and the appellant chose not to testify or put on proof. The jury found the appellant guilty on count one of the solicitation to commit the first degree premeditated murder of Bowser and on count two of the solicitation to commit the first degree premeditated murder of Roberts. The trial court sentenced the appellant to twenty years for each conviction and ordered the sentences to be served consecutively to each other and to a previously imposed sentence for a total effective sentence of fifty years. On appeal, the appellant challenges the sufficiency of the evidence supporting his convictions, the admission of a recording and transcript of the solicitation, the trial court's failure to dismiss count two because of a violation of the Confrontation Clause, and the sentences imposed by the trial court.

## II. Analysis

A. Admission of Recording and Transcript

The appellant contends that the recording and transcript were not sufficiently authenticated and should not have been admitted at trial. He maintains that the "State provided no testimony from an agent of the Secret Service as to how or to what extent the recordings were enhanced or altered." He also asserts that the recording should have been excluded on relevancy grounds. Additionally, he maintains that the trial court erred by allowing the jury to view the transcript, "which prohibited them from directing their attention to the 'best evidence,' which was the audio and video recordings." In response, the State avers that the recording and transcript were properly authenticated, were relevant, and were not unfairly prejudicial. Further, the State notes that the trial court gave the jury a limiting instruction, cautioning that the transcript was merely an aid and that the recording was the

_____

[1] At the time of trial, Captain Huffine was retired.

-8-

evidence. We agree with the State.

Generally, the admissibility of evidence lies within the sound discretion of the trial court. State v. Carruthers, 35 S.W.3d 516, 574 (Tenn. 2000). The trial court's discretion in determining the admissibility of evidence is generally circumscribed by the Tennessee Rules of Evidence. See State v. Young, 196 S.W.3d 85, 105 (Tenn. 2006). An appellate court will not interfere with the lower court's exercise of that discretion absent a clear showing of abuse. See State v. Turner, 352 S.W.3d 425, 428 (Tenn. 2011).

## 1. Authentication

The appellant maintains that the proof at trial reflected that the recording had been enhanced but that there was no proof "as to how or to what extent the recordings were enhanced or altered. Because the recordings were enhanced versions of the audio and video recording, they were not and could not be properly authenticated by" Correll. The State responds that because Correll and Detective Fincher authenticated the recording, it was not necessary for the State to call a witness to explain how the recording was enhanced.[2]

Prior to trial, the appellant filed a motion in limine to exclude the recording and transcript. Defense counsel stated that the State had "a new enhanced version that was prepared by the Secret Service." Upon inquiry by the court, the State responded that the individuals involved in the conversation would authenticate the recording. The State noted that the recording had been enhanced "so it can be better heard." The court said:

> Well, is the person involved within – I mean, that made it with – know whether it's enhanced or not if that's the statement . . . . [A]t this time I'm going to deny your Motion in Limine. I'll just let you make your objections during the trial . . . when it comes up.

As the State prepared to play the recording for the jury, defense counsel objected, stating, "This is an enhanced version of the recording, enhanced by the Secret Service. I have an authentication issue in that I don't think there is anyone here to authenticate the enhancements." The State asserted that the issue had been previously addressed. The court held that Correll "testified that he has viewed it, listened to it, and it's an accurate representation; so your objection is overruled."

"A tape recording that has been enhanced to improve its audibility by filtering out

---

[2]The record does not definitively reflect what enhancement was made to the recording.

background noises and improving the clarity of voices is admissible, so long as it is properly authenticated." 23 C.J.S. Criminal Law § 1419 (2013). Tennessee Rule of Evidence 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims."

Generally, "[a]uthentication requires a showing that the recording is an accurate reproduction of the matter recorded." Neil P. Cohen et al. Tennessee Law of Evidence § 4.01[23] (LEXIS publishing, 6th ed. 2011). "[C]ourts have repeatedly stated that the requirements necessary to lay a foundation for an audio recording must necessarily vary according to the circumstances of the case." 48 Am. Jur. Trials 1 § 270. For example,

> [t]ape recordings and compared transcripts are admissible and may be presented in evidence by any witness who was present during their recording or who monitored the conversation and was in a position to identify the declarant with certainty, and provided the testimony of the witness in whole or in part, comports with the other rules of evidence.

State v. Walker, 910 S.W.2d 381, 394-95 (Tenn. 1995) (citing State v. Coker, 746 S.W.2d 167, 172 (Tenn. 1987) and State v. Jones, 598 S.W.2d 209, 223 (Tenn. 1980)); see also Cohen, Tennessee Law of Evidence § 9.01[3][c].

In the instant case, Correll, who was an actual participant in the conversation, stated that he had listened to the recording and that it accurately reflected the conversation. Detective Fincher, who monitored the conversation as it occurred, also testified that the recording was an accurate representation of the conversation. The trial court found that, based upon the witnesses' testimony, that the recording was an accurate representation and that the recording was adequately authenticated.

Ordinarily, that would be the end of our analysis. However, in the instant case the recording played for the jury was not the original recording. Instead, it was an enhanced re-recording. A properly authenticated re-recording is admissible "on the same basis as the original tape, although ideally the authentication process includes offering the original, as well as the rerecording, in evidence, and affording the adverse party an opportunity to compare the two." 48 Am. Jur. Trials 1 § 289 (citations, footnotes, and internal quotations omitted); see also United States v. Beeler, 62 F. Supp. 2d 136, 150 (D. Me. 1999). The following method for authenticating an enhanced re-recording has been suggested:

> The original recording should first be offered into evidence,

-10-

together with testimony which clearly identifies it as the original. The technician who made the re-recording should then explain how he produced the re-recording. His testimony should include a statement that he made no additions or deletions and did not alter the original in any way except to improve its audibility or clarity. If the defendant wishes to challenge the admissibility of the re-recording, he should be given an opportunity, out of the hearing of the jury, to compare it to the original for accuracy and completeness. If the court concludes that the re-recording is an accurate reproduction of the original, the re-recording is then admitted into evidence and played at trial.

48 Am. Jur. Trials 1 § 291 (internal quotations omitted). It has also been suggested that "[a] permissible less elaborate alternative is for an agent to testify that he has compared the contents of the original recording and the rerecording, and that they are identical." Fishman and McKenna, Wiretapping and Eavesdropping § 37:19; see also United States v. Knohl, 379 F.2d 427, 440 (2nd Cir. 1967). Normally, after the State has sufficiently laid the foundation that the recording is an accurate, authentic, and trustworthy reproduction of the conversation, "the party challenging the recordings bears the burden of showing that they are inaccurate." United States v. Carbone, 798 F.2d 21, 24 (1st Cir. 1986). For the most part, "[a]s with audio recordings generally, courts ultimately seem most concerned that a showing be made that the enhanced audio recording is accurate, trustworthy, and genuine." 48 Am. Jur. Trials 1 § 291.

This court has previously addressed a similar issue in State v. Charles Clay Young, No. 01C01-9601-CC-00195, 1997 WL 469900 (Tenn. Crim. App. at Nashville, Aug. 15, 1997). In Young, after the defendant spoke with his adult nephew Ricky about finding someone willing to kill the defendant's wife, Ricky informed the police about the conversation and wore a recording device the next time he spoke with the defendant. Id. at *1. At trial, the State introduced two sets of tapes, the original and a version that had been electronically enhanced by the TBI. Id. at *2. The defendant objected to the admission of the audio tapes because the State failed to lay a proper foundation and have an officer identify the defendant's voice on the recording. Id. However, the trial court allowed the tapes to be admitted because the officer who monitored the recording testified that the enhanced tapes were an accurate reflection of the conversation he heard transpire between Ricky and the defendant. Id. On appeal, this court noted that "[i]n order to lay the proper foundation for the entry of audio tapes, the moving party must establish either an unbroken chain of custody or positively identify the very evidence presented." Id. at *3 (citing Bolen v. State, 544 S.W.2d 918, 920 (Tenn. Crim. App. 1976)). We noted that the officer testified that he had listened to the enhanced tapes and that they accurately reflected the conversation

he recorded on the day in question. Id. We concluded that the State had established a proper foundation for admission because "the tapes had been positively identified by [the officer] as being an accurate reflection of the conversation he monitored; it is not, therefore, necessary to establish an unbroken chain of custody." Id. Further, this court determined that the defendant's voice on the tapes was sufficiently identified by Ricky's testimony that he wore a recording device when meeting with the appellant, and the officer's testimony that the conversation had been recorded on a certain tape, which was later enhanced by the TBI. Id. Accordingly, this court concluded that "there was substantial evidence that the tapes were of the recorded conversation between the defendant and Ricky. . . . Under these circumstances, the trial court was correct in finding that the tapes had been sufficiently identified for the purpose of admission into evidence." Id. at *4; but see State v. Robert S. Clark, No. W2001-00921-CCA-R3-CD, 2002 WL 1841721, at *3 (Tenn. Crim. App. at Jackson, Dec. 16, 2002) (stating that an expert, who extracted stills from a security video that was properly authenticated and entered into evidence but who was not present during the making of the video, "needed . . . to explain his alterations and their underlying processes in order to support a finding by the trier of fact that the stills were what he claimed them to be").

We believe that the better practice is for the party seeking admission of an enhanced recording to have the individual who enhanced the recording testify regarding the exact nature of the alteration of the original recording to forestall any potential issues regarding the accuracy of the recording. See 23 Am. Jur. Proof of Facts 3d 315 § 53. However, there is nothing in the record that the enhanced recording was anything other than what it purported to be, which was an accurate reflection of the conversation that transpired between the appellant and Correll. Notably, on appeal the appellant does not challenge the accuracy of the enhanced recording. Additionally, at trial during cross-examination the appellant did not question either Detective Fincher or Correll regarding the accuracy of the enhanced recording. We conclude that the trial court did not abuse its discretion in admitting the enhanced recording.

## 2. Relevance

The appellant asserts that portions of the recording were unintelligible and "shows only glimpses of actors to the conversation." He further asserts that the poor quality of the recording confused the jury and created a presumption of the appellant's guilt. He also maintains that the recordings were cumulative to Correll's testimony. The State acknowledges that the recording was similar to the testimony of Correll and Detective Fincher but contends that because the witnesses could only paraphrase what they remembered of the conversation, the recording was not needlessly cumulative. We agree with the State.

Generally, to be admissible evidence must be relevant to some issue at trial. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401; see also State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999). However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. It is within the trial court's discretion to determine whether the proffered evidence is relevant; thus, we will not overturn the trial court's decision absent an abuse of discretion. See State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995). "Under this standard, we will not reverse unless the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Cannon, 254 S.W.3d 287, 295 (Tenn. 2008) (internal quotations and citations omitted).

On the audible portions of the recording, the appellant told Correll and Turner that they needed propane tanks and water hose to cause the explosion. The appellant told Correll to steal, not purchase, the hose. The appellant cautioned that the hose needed to be long enough so that the ignition of the tanks did not injure Correll and Turner. The appellant informed them of the dogs at the mobile home and that Correll and Turner could feed the dogs steak to distract them. Throughout the conversation, the appellant spoke in a matter-of-fact tone. However, at times the appellant seemed excited and repeatedly made sounds mimicking an explosion.

Although the appellant never mentioned the victims' names or paying Correll and Turner on the recording, the conversation was nevertheless relevant to the solicitation charges. The recording confirmed that the appellant was speaking to Correll and Turner and was instructing them how to blow up the mobile home. The appellant maintains that the recording was unfairly prejudicial. We acknowledge that the recording was prejudicial in the sense that it supported the appellant's guilt. However, our supreme court has stated that

> prejudicial evidence is not *per se* excluded; indeed, if this were true, all evidence of a crime would be excluded at trial. Rather, what is excluded is evidence which is *unfairly* prejudicial, in other words, evidence which has an undue tendency to suggest a decision on an improper basis, frequently, though not necessarily, an emotional one.

State v. Thomas, 158 S.W.3d 361, 394 (Tenn. 2005). Further, the audibility of the recording goes to the weight of the evidence and not to its admissibility. State v. Beasley, 699 S.W.2d

565, 569 (Tenn. Crim. App. 1985). Moreover, the recording corroborates the testimony of Correll and Detective Fincher regarding this conversation and was not prejudicially cumulative. Accordingly, we conclude that the trial court did not err in admitting the evidence.

### 3. Best Evidence

The appellant maintains that the trial court should not have allowed the transcript to be distributed to the jury because it was not the "best evidence." The State responds that the trial court correctly allowed the transcript to be distributed to the jury as an aid to listening to the recording. We agree with the State.

Tennessee Rule of Evidence 1002, also known as the best evidence rule, generally provides that in order to prove "the content of a writing, recording, or photograph, the original writing, recording or photograph is required." The rule's purpose is so "only the best or most accurate proof of written or similar evidence should be admitted, to the exclusion of inferior sources of the same proof, absent some extraordinary justification for the introduction of secondary evidence." Cohen, Tennessee Law of Evidence § 10.01[2][a].

As we stated earlier, a transcript is admissible when a witness to the recording was able to definitively identify the declarant and when the evidence comports with the Rules of Evidence. See State v. Reed, 845 S.W.2d 234, 238 (Tenn. Crim. App. 1992). Moreover, "a transcript of a tape may be given to a jury where the jury is instructed that the tape, and not the transcript is the actual evidence." State v. Barnard, 899 S.W.2d 617, 623-24 (Tenn. Crim. App. 1994). In the instant case, Correll and Detective Fincher testified that the transcript accurately represented what was said during the conversation. Lieutenant Morgan testified that he transcribed the recording to the best of his ability. The trial court instructed the jury that the transcript was to be used as an aid but that the recording was the actual evidence. We conclude that the trial court did not abuse its discretion in allowing the transcript to be distributed to the jury.

### B. Confrontation

The appellant summarily argues that he "was prohibited from cross-examining the victim, Ina Roberts, due to her failure to appear for trial [and that] his inability to cross examine the victim violated his Sixth Amendment right to confrontation." The appellant contends, therefore, that the trial court should have dismissed count two of the indictment. In response, the State asserts that the appellant's right to confrontation "was not implicated in this situation" because Roberts did not testify and none of her statements were used against the appellant at trial. We agree with the State.

-14-

The Sixth Amendment to the Constitution provides that "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." In addition, article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused has the right to . . . meet the witnesses face to face." "Although the language of the federal and state constitutional provisions is somewhat different, in determining the rights of an accused under article I, section 9, [Tennessee courts] have traditionally adopted and applied the standards enunciated by the United States Supreme Court." State v. Cannon, 254 S.W.3d 287, 301 (Tenn. 2008); see also State v. Lewis, 235 S.W.3d 136, 144 (Tenn. 2007).

In Tennessee, criminal defendants are entitled to confront witnesses against them under the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. As the United States Supreme Court has explained in the context of the federal right, "the main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination," which includes the opportunity to expose "a witness' motivation in testifying." Delaware v. Van Arsdall, 475 U.S. 673, 678 (1986) (quotation marks, brackets, and emphasis omitted). The exercise of the right to confront "is controlled by the trial judge," and "the trial court's decision will be upheld absent an abuse of discretion." State v. Rice, 184 S.W.3d 646, 670 (Tenn. 2006) (internal quotation marks omitted).

However, this court has repeatedly held that in a criminal case, the State is "under no obligation to produce every possible witness." Hicks v. State, 539 S.W.2d 58, 59 (Tenn. Crim. App. 1976); see also State v. Osborne, 712 S.W.2d 488, 492 (Tenn. Crim. App. 1986). Specifically, this court recently noted that "we are aware of no precedent, and have been cited to none, that would support the proposition that the Confrontation Clause requires the State to call as witnesses at trial any and all individuals who may have actually witnessed relevant events." State v. John Adrian Day, No. E2010-01108-CCA-R3-CD, 2012 WL 2926155, at *6 (Tenn. Crim. App. at Knoxville, July 18, 2012). Because we have concluded that the Confrontation Clause was not infringed by the State's failure to call a witness to the crime, we obviously conclude that the Confrontation Clause was not infringed by the State's failure to call a witness who was tangentially related to the crime. Although Roberts was the intended victim, there is no indication that she knew anything about the proposed crime. The trial court stated that "solicitation doesn't require the alleged victim to testify as long as the State has proven beyond a reasonable doubt that a solicitation to have someone killed occurred." The trial court properly denied the appellant's motion to have count two of the indictment dismissed because of an infringement of the appellant's right to confrontation.

C. Sufficiency of the Evidence

Next, we address the appellant's challenge to the sufficiency of the evidence supporting his conviction. The appellant maintains that although the State showed that he, Correll, and Turner had a conversation about how to construct an explosive device, the State failed to prove that the appellant intended for Correll and Turner to use the explosive device to kill Bowser or Roberts. The State responds that "[t]he record . . . clearly establishes that it was the [appellant's] 'conscious objective' to have [Bowser and Roberts] murdered so they would be unable to testify against him in his pending theft case." We agree with the State.

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proved, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

Tennessee Code Annotated section 39-12-102 provides:

> (a) Whoever, by means of oral, written or electronic communication, directly or through another, intentionally commands, requests or hires another to commit a criminal offense, or attempts to command, request or hire another to commit a criminal offense, with the intent that the criminal offense be committed, is guilty of the offense of solicitation.
>
> (b) It is no defense that the solicitation was unsuccessful and the

offense solicited was not committed. It is no defense that the person solicited could not be guilty of the offense solicited, due to insanity, minority, or other lack of criminal responsibility or incapacity. It is no defense that the person solicited was unaware of the criminal nature of the conduct solicited. It is no defense that the person solicited is unable to commit the offense solicited because of the lack of capacity, status, or characteristic needed to commit the offense solicited, so long as the person soliciting or the person solicited believes that either or both have such capacity, status, or characteristic.

First degree premeditated murder is the "premeditated and intentional killing of [a victim]." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation "is an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself. [However,] [i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Id. at (d). Although there is no concrete test for determining the existence of premeditation, Tennessee courts have relied upon certain circumstances to infer premeditation. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Specifically, the following factors have been used to support a jury's inference of premeditation: (1) the appellant's prior relationship to the victim which might suggest a motive for the killing; (2) the appellant's declarations of intent to kill; (3) the appellant's planning activities before the killing; (4) the manner of the killing, including the appellant's using a deadly weapon upon an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a particularly cruel manner; (5) the appellant's demeanor before and after the killing, including a calm demeanor immediately after the killing. See Pike, 978 S.W.2d at 914-915; State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997).

The proof at trial revealed that in April 2010, Investigator Randolph arrested the appellant for felony theft. Investigator Randolph told the appellant that Roberts and his co-defendants, including Bowser, would testify against him. Thereafter, the appellant approached Correll outside a courthouse about "making [the appellant's] charge partner disappear." On May 25, Correll and Turner, who were working with the police as confidential informants, met with the appellant. Correll was wearing a device that allowed police to listen to his conversation with the appellant. Correll, Detective Fincher, and Investigator Randolph all heard the appellant say that he would pay Correll $5,000 to kill Bowser and Roberts so they could not testify against him on the felony theft charge. The appellant instructed Correll to get water hose and two propane tanks. Captain Huffine saw the appellant drive away from the meeting with Correll and Turner. The following day, Correll and Turner, who were again equipped with monitoring and recording equipment, met

with the appellant. The appellant said that he would obtain two more propane tanks so that Correll could put four propane tanks under Bowser and Roberts's mobile home. The appellant told Correll to steal a length amount of water hose. The appellant instructed Correll how to place the tanks and water hose and to cause an explosion. We conclude that the proof was sufficient to sustain the appellant's two convictions for solicitation of first degree murder.

## D. Sentencing

The appellant maintains that the trial court erred in determining the length of each sentence and by imposing consecutive sentencing. In response, the State asserts that the trial court correctly sentenced the appellant.

Previously, appellate review of the length, range, or manner of service of a sentence was de novo with a presumption of correctness. See Tenn. Code Ann. § 40-35-401(d). However, our supreme court recently announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). Our supreme court has further explicitly stated that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each

felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. "[A]ppellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." Id. at 345-46. "[They are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

Although not noted by either of the parties, we note that the record reflects that a presentence report was not prepared prior to sentencing. The appellant was convicted of two Class B felonies. See Tenn. Code Ann. § 39-11-117(a)(3). Tennessee Code Annotated section 40-35-205(a) mandates that "upon a verdict or finding of guilty, the court shall, in the case of a felony, . . . direct the presentence service officer to make a presentence investigation and report . . . ." In the instant case, the parties refer to a "prosecution report," which listed the appellant's prior criminal convictions. However,

> [t]he[] document[] did not address, in any meaningful way, the circumstances of the offense, [the appellant's] "physical and mental history and condition, family history and background, education, occupation, and personal habits[";] information regarding the enhancement or mitigating factors, information to assist the court in deciding whether and on what terms to grant probation or community corrections; and the [appellant's] financial resources and obligations, in order to assist the court in determining restitution. See [Tenn. Code Ann.] § 40-35-

> 207(a)(1), (2), (3), (5), (6), (7), (9) [(which governs the required contents of a presentence report)].

State v. Danny Ray Hensley, No. E2011-02325-CCA-R3-CD, 2012 WL 5351217, at *3 (Tenn. Crim. App. at Knoxville, Oct. 31, 2012). Accordingly, we must remand for resentencing after a presentence report is prepared. See State v. Jones, 15 S.W.3d 880, 897 (Tenn. Crim. App. 1999); State v. Rice, 973 S.W.2d 639, 642 (Tenn. Crim. App. 1997).

### III. Conclusion

In sum, we conclude that there was sufficient evidence to sustain the appellant's convictions, that the trial court did not err in admitting the recording and transcript of the solicitation, and that the trial court did not err in failing to dismiss count two. Therefore, we affirm the appellant's convictions. However, because the trial court sentenced the appellant without a presentence report, we must remand for the preparation of a presentence report and resentencing.

_____
NORMA McGEE OGLE, JUDGE